Syllabus.

## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

### COVER V. WIDENER AND ANOTHER.

September 17, 1919.

Absent, Kelly, J.

1. PARENT AND CHILD—*Custody of Child—Father and Maternal Grandmother—Habeas Corpus Proceedings—Case at Bar.*—The father of a girl of thirteen had abandoned her and her mother, who, he claimed, had become addicted to the use of laudanum, when the girl was an infant. The girl was placed in the care of her maternal grandmother with the full consent and knowledge of the father when she was a few months old. The girl remained with her grandmother until the institution of the present proceedings, and was maintained and educated by her, the father contributing little or nothing to her support. For a period of ten years the father did not communicate with the grandmother in regard to his child. No evidence was introduced in regard to the father's moral character or financial standing other than his own testimony from which it appeared that he had been a man of bad character up to two years before the institution of this proceeding, at which time he claimed to have reformed. At the time of the institution of the proceeding he claimed to be in receipt of a salary of $112 a month and to have steady employment. The father asserted that it was not his intention to look after the rearing and training of the child himself, but if awarded her custody he would place her in the home of his sister whose husband was wealthy. The only evidence of the willingness of the sister to take the child, educate and care for her, was several letters filed in the record by the father. On the other hand, while the grandmother was not a woman of wealth, she was a woman of the very highest character, belonging to a most estimable family, and the child's associates were the best. The child testified that she was devoted to her grandmother, who had given her every care and attention possible.

   *Held:* In *habeas corpus* proceedings brought by the father to obtain the custody of the child, that an order giving the legal custody of the child to the grandmother, but allowing the father the freest access possible to the child and retaining the proceed-

ings upon the docket for any future disposition that the welfare of the child might require, should be affirmed.

2.  PARENT AND CHILD—*Custody of Child—Father's Primary Right.*— While our law fully recognizes the primary right of the father to the custody of the child, the court will exercise its discretion according to the facts and what appears to be best calculated to promote the infant's welfare, having due regard to the legal rights of the party claiming the custody.

3.  PARENT AND CHILD—*Custody of Child—Financial Situation of Contestants.*—The question is not which of the two claimants can surround the infant with greater luxury, or which of the two will be able to give or bequeath him the greater amount of money or property, but by which of them is he likely to be reared and trained so as to make him the better man and the better citizen.

Error to an order of the Circuit Court of Washington county in habeas corpus proceedings. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Oglesby & Burks,* for the plaintiff in error.

*L. P. Summers,* for the defendant in error.

SIMS, J., delivered the opinion of the court.

This is a *habeas corpus* proceeding involving the custody and control of the infant daughter of appellant.

[1]   The sole assignment of error is, in substance, that under the facts of the case the custody and control of the child should have been given to the father as most likely to promote the welfare and best interest of the child.

The order under review is as follows:

"This day Mildred Roberta Cover was brought before the court, in obedience to the writ of *habeas corpus ad subjiciendum* awarded on the 30th day of September, 1918, against the defendants. And the said defendants made answer that

they had cared for and maintained said child for about eleven years, said child now being twelve years of age, and who had been abandoned by her father, the petitioner; and the court having heard the evidence and arguments of counsel, is of opinion that the said cause of detention is legal and sufficient. It is, therefore, ordered that the custody of the said Mildred Roberta Cover shall remain in the said defendants. It is further ordered that said child shall remain with said defendants from the 1st day of September to the 1st day of June, and that the plaintiff, the petitioner, may have the child from the 1st of June to the 1st of September, respectively, until the further order of the court."

The material facts and the reasons for the decision of the court below will appear from the opinion of the learned judge of that court which is adopted as a part of this opinion, and is as follows:

"Edward L. Cover, a citizen of Bristol, has filed his petition in this court, alleging that his infant daughter, Mildred Cover, is illegally detained in the custody of Davis Widener and wife.

"The record shows that more than fourteen years ago, in the city of Bristol, Edward L. Cover intermarried with Miss Sally DeBusk, of Abingdon, Va. As a result of this union, one child was born, who is the subject of this controversy. For several years, Cover and wife seemed to live together very happily. It is then testified to by Cover that his wife became addicted to the use of laudanum, which caused, according to his statement, an estrangement between him and his wife. Their marital differences became such that Cover sent his wife and infant daughter to her mother, Mrs. David Widener, who lives at Damascus, Va. From the time of this separation, according to the evidence, Cover seemed to have relinquished all claims to the custody of his child and to have forgotten all obligations resting upon him as to the support of his wife.

"During the period Mrs. Cover remained at the home of her mother, Cover did not contribute one cent to her support, nor did he even so much as write a letter to his wife or make inquiry as to her state of health or the condition of his child. Every effort, according to letters filed in the record, was made by Mrs. Cover to ascertain the whereabouts of her husband, but without avail for a long period of time. Cover, when at work, was usually found in the employ of some tanning extract company, and it was to a number of these concerns that Mrs. Cover directed her inquiries as to his whereabouts, eventually writing to his brother seeking information as to Cover's whereabouts, which he, the brother, was unable to give.

"Finally, Cover was located in the city of Asheville, N. C., and it was there that Mrs. Cover who, taking her child with her, found him. Mrs. Cover's condition while in Asheville became such that Cover notified her mother, Mrs. Widener, to come to Asheville, which she did, and Mrs. Cover was placed in a hospital and the expense of her stay in the hospital was borne in the main by Mrs. Widener.

"When Mrs. Cover was taken to the hospital the infant, Mildred, who at the time was a few months old, was placed in the care of Mrs. Widener, with the full consent and knowledge of Cover, who brought the child to her home in Damascus, Washington county, Va.

"After remaining in the hospital for some time, Mrs. Cover went to Knoxville in search of her husband, who had disappeared from Asheville. Being unable to find him, in a fit of despondency, as evidenced by a note written by her to her mother, the supposition is that she took an overdose of laudanum, which resulted in her death.

"Cover's whereabouts, being unknown, Mrs. Widener was communicated with and went to Knoxville and brought back the remains of her daughter, which were buried in Washing-

ton county.   The efforts of Mrs. Widener to locate Cover were unsuccessful.

"As he himself states, he did not know of the death of his wife until some two or three months thereafter.   The testimony of Cover himself is that he had been unsuccessful in business, that the principal disturbance in his married life was his wife's use of opiates; that for ten years after the death of his wife he wandered from place to place seeking employment; that during all this period of ten years he held no communication whatever with Mrs. Widener in regard to his infant daughter; that he contributed very little, if any, to her support, and that he only saw her one time, and that was when he was walking or tramping from Mountain City, Tenn., to the coal fields of Virginia and passed through the town of Damascus and saw a child playing in a yard at the home, as he understood, of Mr. Widener, and he supposed that it was his child.

"He did not stop to make inquiry, nor to linger long enough to speak to his child, but passed on through the town of Damascus.

"No evidence was introduced as to his financial or moral standing, except the testimony of petitioner himself.   In answer to a question propounded by counsel for Mrs. Widener, Cover stated that he had been guilty of about the entire category of crimes; that his life in the past had not been what it should have been, but for the past two years he had reformed from his evil way and was in the employment of the Dixie Tannery Company at a salary of one hundred and twelve dollars ($112.00) per month; that he lived in a boarding-house; that he had no relatives in this section of the State; that during the summer of 1917, since he had rehabilitated himself in business, as he states, he began to take an interest in his child, Mildred; that he visited the home of Mrs. Widener, who received him cordially and affectionately; that he gave his child money and clothing to

the amount of about fifty dollars ($50.00) ; that, with the consent of Mrs. Widener, he took his daughter on a visit to his sister, Mrs. John L. Cover, of Elkton, Va., where she remained during the summer months.

"That it is not his intention to look after the rearing and training of his child himself, but that if awarded the custody of his child, Mildred, that it is his intention to place her in the home of his sister, Mrs. John L. Cover, of Elkton, who, as he states, is the wife of a very wealthy extract manufacturer of Rockingham county.

"That his sister, Mrs. Cover, is a woman of mature years, is the mother of four boys, all grown, two are married and have children of their own. The reason assigned by Cover for desiring the custody of his child is to take her away from her grandmother, as he does not deem the social position of Mrs. Widener conducive to the best interests. of his daughter. No charge is made by Cover that Mrs. Widener is not a proper and fit person to have the care and custody of the child, Mildred, except that as he alleges she is unable to properly educate the child and that Mrs. Widener is not capable of properly rearing his daughter to be an ornament to the society in which he would see her placed.

"The only evidence of the willingness of Mrs. John L. Cover to take the child, Mildred, and educate and care for her are several letters, filed in the record by Cover.

"On the other hand, Mrs. Widener testifies that from the time the child. Mildred, was placed in her hands in Asheville, N. C., that she has given it her constant care and attention; that she is sixty-seven years of age, in a fair state of health; that she resides with her husband, Mr. Davis Widener, in the town of Damascus, and that while she is not a woman of wealth, or, as she expresses it, 'a society woman,' she is fully able, with the help of her husband's son, who is devoted both to her and the child, to amply provide for the child so long as she, Mrs. Widener, may live;

that she has always permitted the father of the child to visit it whenever he saw fit; that it is her earnest desire that the relation between father and child may be as close and affectionate as possible; that she has no desire to deprive the father of any pleasure he may derive from associating with his child and that she is willing for the child to visit him at all convenient times and is more than willing that Mr. Cover, after a neglect of ten years, may have an opportunity of furnishing the child with means with which to clothe and educate it; that all that she shall ask of him is to let the child remain with her a few years longer, and then she is willing to relinquish any claim she may have upon it.

"That the child has been given all Christian instruction of which she is capable; that it is a constant attendant upon the Methodist Sunday school and church, and that since it became of school age it has been a pupil of the Damascus high school, which is one of the very best in the State, employing ten teachers, and that the child is successfully progressing from the school grades until now it is in the fifth grade, the highest grade permissible, according to her age.

"That the child's associates are the children of Henry Diggs.

"Mrs. Widener further testifies that she is the daughter of Daniel Musser, of Abingdon, Va., and the sister of William H. Musser; that her first husband was Isaac DeBusk, of Washington county, and that her second husband, to whom she has been married for twenty years or more, is Davis Widener; that there are no children as a result of this union. It was agreed by counsel that, inasmuch as the court was personally acquainted with the father and husband of Mrs. Widener, that no evidence would be introduced as to their moral, religious and financial standing. This being conceded to be good, Mrs. Widener further stated that she had reared three sets of children; that her mother

82

died, leaving a house full of young children and that upon her, as the elder daughter, fell the responsibility of their rearing; that by her former husband, Isaac DeBusk, she was the mother of three children; that since her marriage to Mr. Widener, who was a widower with several children, that upon her had fallen the responsibility of the care and rearing of his children; that she had been a consistent member of the Methodist church for fifty years and that while she was unable to leave as a heritage either to her own children now living or to the grandchild, Mildred, worldly goods of any large amount, yet she had the consolation of knowing that of those who had been intrusted to her care not a single one had ever gone astray.

"The child, Mildred, who is now in her thirteenth year, testifies that her grandmother, to whom she is devoted, has given her every care and attention possible; that until last summer she had never seen her father, nor did she know that she had a father; that she sleeps in the room with her grandmother, and that while she desires to know her father better and to love him more, that she does not wish to leave her grandmother and to live with her aunt, whom she only met twice in her life; that she was treated kindly by her aunt when she visited her last summer and that she wishes to become better acquainted with her father's people, but that she cannot bear the idea of being separated from her grandmother, who has been to her, up to this time, the only father or mother she has ever known.

"I have been somewhat tedious perhaps in trying to detail the evidence in order to present the situation exactly as I see it is.

[2] "As I understand the rule of law laid down by our supreme court that in controversies over the custody of children, while our law fully recognizes the primary right of the father to the custody of the child, the court will exercise its discretion according to the facts and what appears

to be best calculated to promote the infant's welfare, having due regard to the legal rights of the party claiming the custody. *Coffee* v. *Black*, 82 Va. 567; *Parrish* v. *Parrish*, 116 Va. 476, 82 S. E. 119, L. R. A. 1915 A, 576.

"As has been repeatedly stated by the courts, there is no duty which a court has to perform more difficult than that which confronts a court when it comes to the disposition of a child in a *habeas corpus* proceeding.

"I have given a careful consideration to the evidence in this case, and I cannot resist the conclusion that, however strong the naked legal right of the parent, Edward L. Cover, to the custody of his child may be, that the best interest of the child at the present time demands that he be denied the custody thereof.

"In as much as to the court was left the consideration of the standing and character of Mrs. Widener, I deem it but proper to state that the state of facts show that for womanly virtue, Christian character and motherly devotion, Mrs. Widener is without a superior, in my opinion. Her father, Daniel M. Musser, was one of the most esteemed citizens the town of Abingdon has ever produced, a man who had lived to the ripe old age of seventy-odd years, was a consistent member of the Methodist church for sixty years, against whom, so far as the agreed facts show and so far as I know of my own knowledge, naught of evil was ever spoken. He was a successful contractor and builder, and there are many evidences of his constructive work in the town of Abingdon, which bear testimony to the fact that he was a laborer who wrought well and honestly. Though he was the architect and builder of the majority of homes and buildings in the town, the court records fail to disclose any evidences of any litigation whatsoever in regard to his many contracts. The brother of Mrs. Widener, W. H. Musser, has followed closely in the footsteps of his father. So firmly has his reputation for honesty been established, that

in business dealings with his fellow-men it is seldom that a bond is required, conditioned upon the faithful performance of his contract.

"As an evidence of what I mean, but recently the board of supervisors of Washington county has awarded him the contract to remodel and repair the county courthouse, calling for an expenditure of several thousands of dollars, and this without requiring him to execute bond for its performance.

"For 100 years or more the ancestors of Mrs. Widener have lived and dwelt in the county of Washington, and not once has there ever been a charge against any male member of the family of a violation of the laws of the land, nor against any female member of the family for any departure from the strict paths of morality.

"As stated by Mrs. Widener, she does not belong to the set known as the society set, but the heritage which she will leave to those who come after her that 'no one who has ever been intrusted to her care has ever gone astray,' is a heritage any one should be proud to leave behind. Petitioner Cover states that he wished to place his child in a different environment. The evidence shows that the child's associates are the children of Henry Diggs. Those who are acquainted with the Diggses, Grays and Bakers, who are the pioneer families of Washington county, could not desire more suitable companions for their children than the members of this most distinguished family.

"It is not contended by the petitioner that he personally is in a position to administer to the wants of his adolescent daughter, nor is it contended that if the court would give him the custody of his child that his sister, Mrs. Cover, would make this child her daughter or the beneficiary of her means.

"All that he contends for is, that the court take this child

out of a home of comfort, refinement and Christianity and place it in a home of luxury.

"That it be placed in a situation by which it will acquire luxurious habits without the prospect of a father who is past the meridian of life, and who now earns only $112.00 a month, in a subordinate position, ever being able to minister to the luxurious habits acquired by the child.

[3] "As stated by Judge Keith, in delivering the opinion in the case of *Stringfellow* v. *Somerville*, 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623: "The question is not which of the two claimants can surround the infant with greater luxury or which of the two will be able to give or bequeath him the greater amount of money or property, but by which of them is he likely to be reared and trained so as to make him the better man and citizen."

"Mr. Cover seems fully resolved, as far as he is able to atone for the long neglect of his flesh and blood, and to be willing to look after the comfort and welfare of his child. His statement that he had been guilty of every crime in the category of crimes, conveys to my mind the impression not that he is a criminal, but that he had been in the past a man of dissipated habits, moral and otherwise, and that now he is seeking to rehabilitate himself in the estimation of society in general. And while the court, according to its best judgment, is constrained to deprive him of the legal custody of his child, an order will be entered giving to him the freest access possible in order, as the child stated, that she may become better acquainted with her father, to whom she is growing firmly attached. I think that during the school months, beginning with September and ending with June of each year, that the child should remain with its grandmother, and that during the remainder of the year it should remain with its father and that he should have the right to take the child upon visits to the members of his own family. It is his, and the best interests of the child, in my

opinion, require that it should have some associations with the members of its father's family. The court, instead of dismissing the proceedings, will retain same upon docket for any further disposition that the welfare of the child may require."

The features of the case and the considerations adverted to in the opinion above quoted, which seem to us especially controlling in favor of the correctness of the decision of the court below, are the following: That the father is not in a position to administer to the wants of the daughter or to himself provide for or to assure a provision for her in the future of a home with any better associations or advantages than those of the present home of the child, if as good. That "it is not contended that if the court would give him the custody of his child that his sister, Mrs. Cover, would make this child her daughter or the beneficiary of her means." And, indeed, the record does not show that Mrs. Cover has any wealth of her own. That the court is asked to take the child from her present home "of comfort, refinement and Christianity and place it in a home of luxury. That it be placed in a situation" (which, so far as the record discloses, may be but temporary) "by which it will acquire luxurious habits without the prospect of the father  *  *  *  ever being able to minister to the luxurious habits acquired by the child." And while it is true that the record shows that Mrs. Cover, from the bounty of her husband, may give the child better educational and social advantages than it now enjoys, which are not to be undervalued, such advantages are not always unmixed blessings. For if they are to be but temporary surroundings they might and would most likely prove to be adverse, instead of beneficial, in influence upon the future character, happiness and welfare of the child. Hence, in view of the present showing of the record as to the probable future position in life of the child, we are

of opinion that the court below acted wisely and rightly in the premises.

As to the future: The suit still remains upon the docket of the court below, and should Mrs. Cover be willing, or the father demonstrate his ability, to make such provision for the child that the latter may be assured both of better educational advantages and of adequate means during the coming years to minister to the tastes and habits which would be the normal result of the changed environment, the court may make such future orders in the cause as may best subserve the welfare and best interest of the child.

The order under review will, therefore, be affirmed.

*Affirmed.*