## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### WESTWOOD AND SUSAN HUTCHISON V. W. S. HARRISON.

#### June 16, 1921.

1. PARENT AND CHILD—*Habeas Corpus—Custody of Child.*—In controversies. relating to the custody and control of children, the interest of the child is the primary consideration, and, if it is of the age of discretion, it should be consulted, and due weight given to its decision.

2. HABEAS CORPUS—*Father and Child—Custody of Child as Between Father and Grandparents—Case at Bar.*—A father residing in Tennessee instituted *habeas corpus* proceedings in Virginia to recover the custody of his daughter, a girl of thirteen, from her maternal grandparents. It appeared from the medical and other evidence that the daughter's health was bad while residing at intervals with her parents in Tennessee, and improved on returning to her grandparents in Virginia. The girl was of a very sensitive disposition and testified that she strongly desired to remain with her grandparents, of whom she was fonder than of her parents. The mother of the girl had suffered much from extreme nervousness and bad health, but at the time of the trial appeared to be much improved.

   *Held:* That the order of the lower court conferring the custody of the child upon her father should be reversed, and the proceeding remanded with directions to keep the same on the docket for such further orders as might prove to be necessary, and that the child might elect at any time whether she would go to her parents or remain with her grandparents.

Error to a judgment of the Circuit Court of Prince William county on a petition for habeas corpus. Order for petitioner. Respondents assign error.

*Reversed and remanded.*

The opinion states the case.

*Robert A. Hutchinson, C. A. Sinclair* and *H. Thornton Davies,* for the plaintiffs in error.

*Thomas H. Lion* and *T. E. H. McCroskey,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This is a *habeas corpus* proceeding involving the custody and control of Susan Ish Harrison, infant daughter of the petitioner and granddaughter of the respondents.

The grandparents, who are the plaintiffs in error, charge that the trial court erred in three respects:

1. "In deciding the case upon an erroneous theory of law, as revealed by the following incident of the trial:

"During the trial of this cause, the respondents, by their counsel, stated to the court their view of the law governing the case as follows: 'The crucial question is this, and it is one of primary consideration, what are the rights of the child, and the rights of the litigants who are involved to a lesser extent?' Whereupon the court ruled on the question, and stated the law to be as follows: 'I think the rights of the parents is the primary question as well as the welfare of the child.' To which ruling the respondents excepted."

II. "The action of the court in refusing to hear testimony as to the condition of the child after the general testimony was concluded and prior to the rendition of the court's judgment."

III. "The order of the court awarding the petitioner the exclusive custody of the child."

The order under review is in part, as follows: " * * * And the said judge being of opinion that the petitioner, Walter S.

Harrison, is entitled to the exclusive custody and control of his daughter, Susan Ish Harrison, it is therefore ordered that upon the application of the said Harrison, or his counsel of record, the respondents shall deliver to the said Harrison his said daughter at the home of said respondents in Manassas, Va." A writ of error and supersedeas were awarded to this order by one of the judges of this court.

The testimony in this case is very voluminous, making it difficult to present the material and pertinent facts within the limits of reasonable abridgment.

It appears that W. S. Harrison, the petitioner, intermarried with Mary Julian Hutchison, daughter of the respondents, in November, 1904, at the home of the latter in Manassas, Va., and departed thereafter to the home of the husband in Tennessee. In November, 1905, Mrs Harrison returned to the home of her parents, and in December of the same year, the subject of the present controversy was born. She was named Susan Ish, the maiden name of the maternal grandmother. Some little while after the birth of Susan Ish, the mother returned to Tennessee, taking the child with her. As a baby this child was nervous and sensitive, traits that have remained with her to the present time.

In the spring of 1906 a telegram was received stating that the baby was extremely ill, and asking the grandmother to come to the mother's aid. Mrs. Hutchison left at once, and stayed with her daughter several months. During that time the mother was extremely nervous, and the grandmother nursed the baby for her day and night. Returning to Virginia, and pursuant to advice given to the parents by physicians, the grandmother brought the baby with her. The child stayed in Virginia from August, 1906, to about the same month in 1907, when the mother came in from Tennessee. During this year prior to the arrival of Mrs Harrison the care of the baby largely devolved upon

the grandmother.    After a brief stay with her parents,
Mrs. Harrison returned to Tennessee, taking Susan Ish with
her.    Another child had been born in the meantime.

In May, 1909, the grandmother went to Tennessee to
visit her daughter, returning in June of the same year.
She states that she found Mary Ish pale and thin, and at
the request of the mother, she brought her back to Vir-
ginia, both thinking that the change would be beneficial to
the child.    In the same year Mrs. Harrison visited her
parents, accompanied by her little daughter, Annie, and
when she returned to Tennessee she took Susan Ish with her.
The child stayed in Tennessee until 1911, when the grand-
mother received an urgent call to go to her daughter who
was seriously ill.    She went at once, and when she returned
she brought back Mrs. Harrison and the children with her.
Mrs. Harrison improved very rapidly in Virginia, and re-
turned to her home in the fall of the year, leaving Susan Ish
with her grandmother.

Another girl was born to Mrs. Harrison in December,
1911.    In December 1911 or January 1912, Mrs. Hutchi-
son visited her daughter, accompanied by Susan Ish.    The
grandmother states that when she brought Susan Ish from
Tennessee in June, 1911, she was thin and emaciated, and
her articulation imperfect.    In addition she was extremely
nervous.    She improved greatly in Virginia.    When the
grandmother returned in December, 1911, or January, 1912,
Susan Ish returned with her, and from that time forward
the child has chiefly resided with her grandparents.    The
grandmother states that the child returned upon the under-
standing that she would remain in Virginia as long as re-
quired to secure her health and welfare.

In 1912, on account of Mrs. Harrison's condition, Mrs.
Hutchinson sent her daughter, Susan, to Tennessee.    The
latter stayed with Mrs. Harrison three months, and then
returned to Virginia with her sister and her two little

daughters.   During Mrs. Harrison's stay in Virginia, she received medical treatment at the hands of Dr. Bovee, of Washington.   In 1914, Susan Ish, at her mother's request, visited the latter in Tennessee, staying several weeks. The father telegraphed the grandmother that Susan Ish was ill, and she hurried to her bedside.   After conferences with the parents, the grandmother returned, accompanied by her granddaughter.

In January, 1916, Susan Ish, accompanied by her aunt Isabel, visited her parents, staying six months.   According to her grandmother, the child left Virginia looking well.   On her return she was badly run down.   The grandmother went for her.   Returning she brought Mrs. Harrison and the three children.   While in Virginia, Mrs. Harrison was taken to the Takoma Park sanitarium, and treated by Dr. Foye.   When Mrs. Harrison returned to Tennessee, she left both Annie and Susan Ish with their grandparents.   Mr. and Mrs. Harrison came for Susan Ish in July, or August, of 1917.   She had not been well for some time, and the prospect of being taken from her grandparents affected her very prejudicially.   The parents and grandfather had one or more conferences on the subject. The latter, as well as the grandmother, was anxious for the child to remain in Virginia.   Finally, after a somewhat exciting conversation which greatly disturbed Susan Ish, the grandmother states that she told the parents: "This thing is settled.   You are not going to take Susan.   She is going to stay here."   "And they wanted to know who settled it; and I said: 'I settled it.'   I did not settle it because it was settled by Mr. Hutchison and Mr. Harrison, but it was settled by me because I wanted the noise stopped, and I thought it was settled, and she was going to stay here."

Later in the year, 1917, the grandparents having positively refused to deliver custody of the child, the proceed-

ings in *habeas corpus* were instituted by the father of Susan Ish.   The respondents to this petition were the grandparents, Captain and Mrs. Westwood Hutchison.

The attitude of the grandmother towards her daughter, Mrs. Harrison, and the circumstances under which she undertook the care of the little granddaughter, are revealed in the following extract from her testimony:

"Mrs. Harrison is my daughter, and a daughter that I love, a daughter that I have always loved.   She was a dear little girl.   She waited on me so carefully when I was sick, little girl that she was, and I always thought I would like to show her some peculiar attention, and in her married life it came, and I did it.   I did it happily, and I did it joyfully and willingly, and my daughters did it for my sake as well as for her sake, and I know that I would not say anything against her.   I protected her as I would little Susan.   She is mine.   She is mine first."

"Q.   In answering those calls from Tennessee, was your response on account of Susan Ish alone, or your daughter alone, or both?

"A.   I think more response was for my daughter first. When it came that the child was sick, I know my husband said: 'You go, the little baby has probably passed away. If it is very sick, it will not live very long, but there is our daughter.   You can comfort her.'   I brought the little child back for her sake.   I would take that little child for her sake, until I realized I would have to do it for the child's sake."

Again on cross-examination:

"Q. You love this child as well as any of them?" (*i. e.,* her children.)

"A.   I love this child very dearly.   I have never compared my love for her to my love for them.   I love them

and I love her.   I love her well enough, Mr. Lion, to do for
her to the very best of my ability.   When I took that little
thing, I was asked to take her.   I had to weigh the thing,
whether I could take her.   My youngest boy and girl are
not grown, I said.   But I had the care of ten children and
knew what it meant, and I weighed that carefully.   I did
not make a decision right at once, but I brought her home
with me, and if you could see me having the care of that
child on the train, sick and all of that, and I brought her
to my home, and in fact I would rock her all night long to
go to sleep.   For one year I did not go to my prayer meet-
ing but twice.   I gave myself unstintedly to her, but I tell
you that was a little baby, and back of it was my own
daughter, my love for my own daughter.   I do love my lit-
tle grandchild."

It is a fact in the case, whatever the reason may be, that
the health of the child Susan Ish seemed to improve in Vir-
ginia, and to decline in Tennessee.   We will not undertake
to determine whether this was due to physical conditions in
the respective States, or to the environment in the respec-
tive homes, or to both.   Undoubtedly, the child began life
as a nervous and sensitive baby.   It was her condition that
caused the mother to telegraph to Virginia for Mrs. Hutch-
ison in 1906.   It is equally certain that for several years
thereafter the grandmother and other members of the fam-
ily in Virginia were called upon for further aid on account
of the child's condition.   The mother returned to Tennes-
see in 1907, taking Susan Ish.   In 1909, the grandmother
visited her daughter and found her namesake pale and thin.
At the request of the mother, she brought the latter back
to Virginia, in the hope that the change would improve her.
The mother returned with the child to her Tennessee home
in the latter part of the same year.   In 1911, the grand-
mother received an urgent call to go to her daughter.   She
found Susan Ish thin, emaciated and very nervous, and

on her return to Virginia brought the child and its mother with her. The child improved very greatly in Virginia. After an intervening visit to Tennessee, Susan Ish again visited her mother in 1914. In a few weeks a telegram came from Mr. Harrison that the child was seriously ill. The grandmother hurried to her aid, and subsequently brought her to Virginia. In January, 1916, Susan Ish visited her mother and stayed six months. She was looking well when she went to Tennessee, but came back badly run down. The evidence of the family as to Susan Ish's physical condition at the different points of time mentioned in the foregoing abridgment of her life history, between 1905 and 1917, is fully sustained by the testimony of competent physicians.

Dr. W. F. Merchant treated her upon her return from Tennessee in 1916 until the spring of 1917. He "treated her for malaria, and found her in a very nervous and under-nourished condition." He states that constitutionally she is a "nervous, or supersensitive" child, and thinks she contracted malaria in Tennessee. Testifying apparently in 1917, or 1918, Dr. Merchant stated that Susan Ish was then in "good condition physically, and her growth has been of normal extent;" further that she was "apparently free from malaria," and had "steadily improved from 1916."

Dr. Frances Foye, of Washington, treated both the mother and the child Susan Ish. She states that the child was a nervous, delicate child. She operated on her for adenoids in 1911. At that time, quoting Dr. Foye, she was "a very delicate, pale, emaciated child, hollow-chested, and with a bad heart murmur, no vigor of any kind, muscular or blood, and very anaemic." Further, Dr. Foye says: "I have always felt that she was a hypersensitive, nervous organization, and was timid and acted in a frightened way whenever I tried to do for her, almost trembling, and I felt that she needed feeding up and building up and caring for

in every way possible to give her a chance for her life."
Dr. Foye saw the child again in 1916, upon her return from
a six months' visit to Tennessee. She describes her then
condition as being very nervous and emaciated, that she
"was not in a very much better condition than when I had
seen her in 1911, except she was much taller and had got-
ten more self-assurance and would talk to me and answer
my questions, but she was then very anaemic and a delicate
child." The child told Dr. Foye that she had "been to
Tennessee and had not been happy." Dr. Foye also saw
the child before she went to Tennessee in 1916, and con-
trasting her then condition with her condition on her re-
turn six months later, states that it was very much better.
She was asked to give the result of her observations extend-
ing through several years as to whether the child throve
better in Tennessee or in Virginia. Her answer was, "Well,
my testimony so far is a self-evident fact that I thought
she thrived better with her grandparents."

The following questions and answers are taken from Dr.
Foye's testimony:

"Q. When is the last time you saw this little girl until
today, when she came up and spoke to you?

"A. I vaccinated her here a few weeks ago.

"Q. You mean in Washington, I take it?

"A. Yes, sir. I am referring to the time when I said
'here.'

"Q. Will you state to the court what appeared to be the
condition of the child, as compared to her condition when
you treated her in 1916 upon her return from Tennessee?

"A. She is a very different child.

"Q. In what respects?

"A. In every way. She is contented and happy, bright,
and I cannot say she is vivacious, but she is certainly dif-
ferent in every way, and has certainly developed very much

in the past two years. She has grown taller, and that is the natural outcome of life, unless she was a dwarf.

"Q. Did she have the appearance of a child who was growing up under normal conditions?

"A. She certainly did.

"Q. Did she have the appearance of a child who had normal surroundings when you saw her in 1916?

"A. No. She was—I tell you she was timid, backward, trembling, and her voice was trembling, and on the verge of crying at everything I asked her, and when I wanted to examine her, just a request to have her go through some stunts, I had to repeatedly tell her over and over again, as if I could not hold her attention.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Q. I will ask you if you ever characterized the child as being like a delicate flower?

"A. I did.

"Q. She is of a supersensitive nature?

"A. Yes.

"Q. She is required to be handled like a delicate flower?

"A. Yes."

There is much more to the same effect in the testimony of Dr. Foye.

During the intervening period between December, 1905, when Susan Ish was born, and the latter part of the year 1916, Mrs. Harrison was in bad health. She had occasion, as noted, to make frequent calls upon her people in Virginia. At one time in Tennessee, she seems to have been in a very bad state indeed. She was operated on by Dr. Bovee in 1912, and was treated by Dr. Foye at the time that she was sent to the sanitarium in 1916. In that same year, before coming to Virginia, she was also sent to a sanatarium in Tennessee, and the husband writing to Virginia about her distressing condition, concluded his letter by saying: "I am at a loss to know what is best for

Julian" (*i. e.*, his wife). Testifying in 1918, Mr. Harrison stated that his wife had much improved in every respect, though "a little bit nervous at times." This statement as to the wife's improvement is corroborated by the testimony of other witnesses.

It appears from the record that as time passed, and Susan Ish came to spend more and more time in Virginia, the relations between the daughter and Susan's grandparents became strained. The mother seemed to think that her parents were trying to alienate the child's affections, and to take her permanently from her natural home. On the part of the grandparents a feeling developed that the mother was not mindful of the sacrifices which they had made and the aid which they afforded, primarily on the mother's account, and later, as Susan Ish found her way into their affections, on the latter's account. There is no reason to believe that the parents and the sisters acted from other than the highest and purest motives. When Mrs. Harrison was in distress, they went to her aid unstintedly and unselfishly. This will strikingly appear from the following extract from Dr. Foye's evidence:

"I would like to state this with the court's permission, that in the years I have known the Hutchison family, and my experience with them, there has always been some time that some member of the family was going to Tennessee because of some trouble down there, that some member of the family was going down there, or Mrs. Harrison was coming to them, and I remember very distinctly Susan Hutchison going to Tennessee, and I forbade her because of her own physical condition, but she said there was nothing else to do, that Mary Julian (*i. e.*, Mrs. Harrison) was in straits, and she must go, and my history of the family is that they have always been doing something for the family in Tennessee. I am not an intimate friend of the Hutchison family in any way, I am simply a physician."

But while it is evident that the old intimacy of feeling and wholehearted devotion between the daughter and her parents and the household in Virginia was slowly breaking down as the years passed, there was no positive breach in their relations until 1917. The mother and her children made frequent trips to Virginia. The child, Susan Ish, alternated between the homes of her parents and grandparents, spending an increasing proportion of her time with the latter. There was nothing, however, to hinder the parents from keeping the child in Tennessee on the occasion of any one of her frequent visits to that State. If on the one hand the parents, as they now state, were reluctant for the child to leave them, and were apprehensive that the grandparents were continuing to take her permanently out of their lives, they consented for the child to return to Virginia, though the friction over her coming and going increased. The grandparents insisted that the child's health required that she should stay through her early girlhood in Virginia, and as she grew into their hearts, after all the care and affection that they had lavished upon her in the period of her tender childhood, they considered that they had some sort of moral right for their requests to be regarded. They do not set up any claim to the child resting upon any formal and sufficient contract, nor do they seem to have considered that the child's stay with them would be at best more than temporary. They wished to see her health restored, to see her grow up in strength and vigor, and then to return well and happy to her father's home. Nor have they sought to wean their granddaughter from her parents. A few extracts from Capt. Hutchison's testimony will illustrate his attitude:

"We have always tried to cultivate on the part of the child an affection for her parents, looking to the time when she would be in her parents' home. Never by any word of

mine, and so far as I know, of the family, has there been any attempt to wean her from her parents."

"Q. Since this child has been in your home, what has been your purpose and intention in regard to her permanent return to Tennessee?

"A. I never had a thought until this suit was instituted but what she would go to her parents.

"Q. Go to her parents at what time?

"A. At such time as her health would permit.

"Q. Do you think that time has arrived or not?

"A. I think not, under the circumstances."

Again, referring to what the grandparents considered their moral claim to a portion at least of the child's life, and in response to a question, the grandfather says: "I mean by that, that I thought in consideration of the fact that for the benefit of my daughter we had always re-. sponded to her appeals, and for the health of this child, she had been in my home. I had had her doctored, I had had her treated by specialists, and it looked to me I had some moral right in her, by reason of the fact that the child really owed her life to the care and attention of my wife, and to my willing expenditure of the necessary medical attention to build her up into a healthy child."

Further on cross-examination, Capt. Hutchison stated that the child was with them, in the first instance, "entirely for her health and with no thought in the wide world but that as she recovered and got strong, she would go back; but as the years went by, I say naturally she got entangled in her affections here." Further and later the witness states: "The interest of the child, now Judge, has reached that stage with me that it is of paramount importance. You must remember that I have practically raised this child."

The correspondence between the grandfather and his daughter and son-in-law, throws perhaps a more revealing light upon the attitude of the former than his statements on the stand.   At all times the health and interests of the child and not his mere desire to have her with him, appear to have been foremost in his mind.   These letters also perfectly indicate that he is in full sympathy with the natural desires of the parents to have their child in their own home. Writing to his daughter and her husband in 1913, he says:

"My dear Children:

"Yours came duly to hand, and note you want Susan to come with Sister Annie when she makes her trip to Tenn. I think it very natural that you should want your little girl home, and I have often wished that the distance was not so great, so she could be more with you.   Now I am going to tell you something I have never mentioned before as I did not want to distress you.   Susan has a tendency towards what the doctors call 'glandular tuberculosis,' * * * You remember how her little knees were puffed around the joints.   That has disappeared, which shows the trouble is yielding to the present treatment. * * * For your sakes I will be glad when you can with safety have her in your own home, and it looks like she is growing stronger every day.   I know what it is to be separated from children.   I put one of mine on a train and sent him to Colorado in search of health. * * * So we are doing what the doctor advised for Susan, and asking God in His goodness to give her a strong, healthy body, so you can have the great pleasure of a healthy little girl in your home."

Writing in 1913 to his daughter, Capt. Hutchison says:

"Dear Daughter:

"Your letter came Saturday and it grieves me beyond expression to think my letter was not understood * * * I

have never from the time the little one came into our home, almost in the grave, have I lost sight of the fact that the time would come when she would go home. Both your mother and I have ever kept in mind the time when she would have a strong healthy body. And to this end we have given ourselves unstintedly, and we have hoped that if she continued to grow strong, that in another year the tendencies of which I wrote you might disappear." Letters in 1914 to his daughter and her husband all indicate that the primary concern of the grandfather is not the retention of the grandchild, but the betterment of her health. In one of these letters he speaks of giving up many things that money could secure in order to provide treatment to "physically fit" Susan Ish for life. In 1915 he writes his daughter:

"No, I don't lose sight of a very evident proposition, as you admonish me not to do, nor have I ever done so; that is, that Susan is yours and Walter's child, your 'first born.' But she is here and thrives as she never has elsewhere." Writing in 1915 to his son-in-law, he says: "I have no idea or purpose—never have had, nor any member of our household—any such idea of coming between parents and child. On the other hand we have desired and encouraged the feeling and consideration that should exist between each other, and I know it will be gratifying to you to know how tenderly she remembers your fatherly kindness to her when she was in your home last, and how she greatly treasures a letter or token of remembrance. Later, writing to the father, he says: "Julian ought to see that Susan's stay with us is due to no selfishness on my part, or to the members of the home, but to give the little body, that had such a pitiful start in early life, all possible chance to grow into healthy childhood. As she thrives here and does not elsewhere, what is your answer from the heart of a father responsible for a human life, as to where is the

best place for that life? Would you not rather have her well here than sick and suffering there? What do you think of her *right?"*

These letters and others reveal a growing tension between the parties, but they throw light upon the general situation, and repel the contention that the grandparents had turned the child against her parents. On the contrary, they appear to have sedulously encouraged the proper filial affections in Susan Ish, thus enhancing the effect and importance of her deliberate choice when asked later whether she wished to go to Tennessee or remain in Virginia. If the mind of the child had been poisoned against her parents during her years of sojourn with her grandparents, the weight to be given to her decision when she was examined, would be largely discounted. Further, the references in the letters to the health of the child, her decline in Tennessee and her improvement in Virginia, are fully supported by the evidence in the record, some of which has been cited.

The father is a prosperous business man, able to support his child, send her to school, and reasonably provide for her future. The mother's health has improved and she is undoubtedly eager to have her child with her. On the other hand, the only real home that Susan Ish has had has been with her grandparents. In that home she has had lavished upon her the tenderest and most sympathetic care. She has passed from weakness to strength. She has been the idol of the household. She has been treated as a "delicate flower," and a "supersensitive nature," should be treated.

The case is a difficult one. The father and mother must be considered, the grandparents have certainly claims to consideration, if no positive legal rights, and the child is old enough to have a voice in the determination of her future. On the maternal side the grandparents are well able to provide physical comforts, education, medical attention,

and in a real sense, a present and future home for the grandchild. They are people of high standing and character, and sufficient property, though not wealthy. Hence, the child would have what money can afford, within reasonable limits, whether she remains in Virginia or goes to Tennessee, so that the consideration of these elements cannot be made a controlling factor in this case.

The highest court of this State has dealt with many cases involving the custody of children in proceedings in *habeas corpus,* hence it will not be amiss, in this connection, to ascertain the controlling principles in such controversies, as announced by this and other tribunals.

*Stringfellow* v. *Somerville,* 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623, was a proceeding in *habeas corpus* for the custody of a small child. The prayer of the petitioner was denied. The following citations are taken from the opinion in that case: "Where the father is before the court claiming to recover the custody of his child, the court will exercise its discretion according to the facts, and continue what will be best calculated to promote the infant's welfare." *Coffee* v. *Black,* 82 Va. 567

"In *Green* v. *Campbell,* 35 W. Va. 699, 14 S. E. 212, 29 Am. St. Rep. 843, the above principles are thus stated: "The father is the natural guardian of the infant child, and, in the absence of good and sufficient cause shown, is entitled to its custody. But the court is in no case bound to deliver the child into the custody of any claimant, but may leave it in such custody as the welfare of the child may appear to require."

"We are not dealing with absolute rights of property," says Judge Brewer in *Chapsky* v. *Wood,* 26 Kan. 650, 40 Am. Rep. 321. "A parent's right to the custody of the child is not like the right of property, an absolute and unconditional right, for, if it were, it would end this case and relieve us from all future difficulties." And further on he says:

"The paramount consideration is, what will promote the welfare of the child?" *Stringfellow* v. *Somerville*, 95 Va. 706, 29 S. E. 685, 40 L. R. A. 623.

In the case of *Parrish* v. *Parrish*, the physical condition of a nervous child, five years of age, and its susceptibility to disease furnished one of the grounds on which the father's request for its custody was denied. The father lived in another State. Said the court: "There is no duty which a court has to perform more difficult than that which confronts us in this case, for whatever our decision may be, we are compelled to turn a deaf ear to the pleadings of nature. * * * As the wisest solution of this difficulty, the tendency of the courts has been, in recent years especially, to consider all the facts and circumstances of the particular case, and to determine what is best for the present and future interests, moral and physical, of the child. Our law fully recognizes the primary right of the father to the custody of the child." *Parrish* v. *Parrish*, 116 Va. 481, 82 S. E. 121,.L. R. A. 1915A, 576.

The recent case of *Cover* v. *Widener* was a controversy between the father and the maternal grandmother over the custody of the infant daughter of the petitioner, a child about thirteen years old. The child had lived with her grandmother from her early infancy. In some respects the facts of this case parallel the facts of the case in judgment. The grandmother stated that it was her earnest desire for the relations between the father and child to be as close and affectionate as possible, that she was willing for the father to visit the child; that she only asked that the child be allowed to stay with her a few years longer. The child was examined and stated that her grandmother had given her every possible care and attention, and that she did not wish to leave her; that she wished to know her father better and to love him more, and to become better

acquainted with her father's people, but she could not bear the idea of being separated from her grandmother, who had been a mother to her. The trial court concluded, upon the whole, and in this conclusion the appellate court concurred, that however strong the naked right of the parent, E. L. Cover, to the custody of his child might be, the best interests of the latter demanded that for the time the parent should be denied the custody thereof. This court approved the following statement of principle: "While our law fully recognizes the primary right of the father to the custody of the child, the court will exercise its discretion according to the facts and what appears to be best calculated to promote the infant's welfare, having due regard to the legal rights of the party claiming the custody." *Cover* v. *Widener*, 125 Va. 643, 100 S. E. 459.

*Coffee and Wife* v. *Black* was a controversy over the possession of a young child. The syllabus of that case is as follows: "When a person entitled to, but not having the custody of, an infant, is claiming to recover it, the court will exersise its discretion according to the facts, consulting the infant's wishes, if of years of discretion, and if not, exercising its own judgment as to what will be best calculated to promote the infant's welfare, having due regard to the rights of the claimant." *Coffee* v. *Black*, 82 Va. 567. The court in this case makes the following citations approvingly:

"The law, in this country at least, prescribes no age at which the child shall be presumed to have discretion adequate for this purpose. The court prefers to exercise its own judgment in each case upon the competency of the child. It looks to the capacity, information, intelligence and judgment of the child. It removes, as far as possible, all improper influences by which parties interested in its custody may seek to bias its choice, and if it finds the child able to reason sensibly, though as a child,

in regard to its condition and its preferences and prospects, it will take its wishes into consideration." Hurd on Hab. Cor. 532, *Id.* p. 570.

"Lord Denman, Ch. J., said, in the case of *Rex* v. *Greenhill,* 4 Ad. & El. 624: 'When an infant is brought before the court by *habeas corpus,* if he be of an age to express a choice, the court leaves him to elect where he will go.' " *Id.* p. 570.

In *Merritt* v. *Swimley and Wife,* another *habeas corpus* case, we find the following: "It is to be observed that in all cases the interest and welfare of the child is the great leading object to be obtained, and therefore if it be of an age sufficiently matured to judge for itself, the court will free itself from the responsibility of determining the controversy by leaving it at liberty to go where it pleases." *Merritt* v. *Swimley and Wife,* 82 Va. 437, 3 Am. St. Rep. 115.

"The decided cases establish the principle that the court has a discretion upon the subject, and that the interest of the child is the chief consideration to be looked to." *Id.*

"In cases like the present proceeding under the writ of *habeas corpus,* the technical legal rights of the parties do not govern. The welfare of the infant is the pole-star by which the discretion of the court is to be guided. But the legal rights of the parent are to be respected." *Id.* p. 437.

The court, concluding its opinion, said: "The real question in a case like this is not what are the rights of the father or the other relatives to the custody of the child, or whether the right of the one be superior to that of the other, but *what are the rights of the child?* This cannot be considered as a question involving a right of property in the child. The true view is that the rights of the child are first to be considered and those rights are clearly to be protected in the enjoyment of its personal liberty, according

41

to its own choice, if arrived at the age of discretion. * *". *Id.* p. 440.

The citations made abundantly sustain the proposition that, in this State at least in controversies of the character of the case in judgment, the interest of the child is the primary consideration, and that if it is of the age of discretion, it should be consulted, and due weight given to its decision. There is no restraint of Susan Ish contrary to her wishes. If the grandmother, or grandfather, or both, have refused to allow her to be taken by her parents, this action has met her full approval. She is under no constraint, save the constraint of affection. She is not to be dealt with by the court as if she were an inanimate chattel. The rights of the parents, great as they are, and proper to be considered, are not property rights, and may not be administered, or regarded, as such. Our task is to determine whether the grandparents of this child should be required to deliver her to the parents contrary to the child's expressed wishes, and whether such action would be to the best interests of the child? Our action must be controlled by the evidence in the record, and the principles cited. The child was examined by the judge when she was in her thirteenth year. She answered his questions clearly, directly and intelligently. She told of her school life, her church and Sunday school associations, and her love for her grandparents. Pressed to say which she loved the more, her parents or her grandparents, she replied that she loved the latter more. Asked why, she repiled that she "had lived with them more, and she thought they loved her more." Interrogated on the latter point, she went into many details. When asked to state where she preferred to live, she replied at Manassas. A rather pathetic letter to her grandfather, from Tennessee, revealing her state of mind and anxiety to return to Virginia, is filed with her testimony. Other letters revealing

her desire to return to her Manassas home are also filed. She says in her testimony that she was not happy in Tennessee, and gave her reasons in detail, adding that she never remembered "not wanting to come back to Virginia." On cross-examination, in response to a question, she says that her grandparents "have always told me, if I wanted to go back (*i. e.*, to Tennessee), I could go." On re-examination, when questioned on the same line, she replied: "I think I said to him once (the grandfather) they wanted me to come back to Tennessee, and I said: 'You would let me go, wouldn't you, dada.' He said: 'Certainly, whenever you want to go back home, go.' "

The attitude and wishes of the child constitute a powerful plea against disturbance of present conditions. In *Merritt* v. *Swimley, supra,* the child examined by the trial judge was twelve years old when her wishes were consulted, and in her fourteenth year when her decision was approved by this court. Susan Ish, when she testified was between twelve and thirteen. She is now between fifteen and sixteen.

It is needless to consider in further detail the circumstances under which the child's affections have become entwined about her grandparents. That they have centered there is *en fait accompli,* and as such admitted by the parents. In his petition Mr. Harrison concedes that, "the said infant feels closer to them (respondents) than to her natural parents, and will now say she prefers to remain and abide with her grandparents."

The following extracts are taken from the father's testimony:

"Q. I believe you admit in your petition that the child is more devoted to her grandparents than to her own parents?

"A. Seemingly she is. She talks that way. * * * *

"Q. Have you ever made any effort to ascertain from this little girl exactly what are her wishes and preferences in this matter?

"A. I have asked her if she wanted to go home. She always said 'No,' that she wanted to stay with her grand-dada. She has been here so long, her affection is wrapped up in her grandparents.

"Q. She calls you papa?

"A. Yes, sir."

The witness does not seem to attach much importance to the child's wishes, or her decision in the choice of a home. At one time he says that he did not think that a father had to consult his child as to where she should live. At another time he says: "I thought I had all rights with my own child. I appreciated that the child loved the grandparents and that they loved the child."

"Q. You are basing your claim primarily on your legal rights?

"A. Yes, sir. * * *"

At another place the witness says: "I realized that there was undue affection (*i. e.*, on the part of the child) for the grandparents." Incidentally, it may be said in connection, that Mr. Harrison frankly states that the grandparents have given his child a good home.

Having ascertained the attitude of Susan Ish out of her own mouth with respect to returning to Tennessee, it may be well to ascertain the probable effect upon this nervous, excitable, delicate and supersensitive child of a compulsory return to her father's home, its likely effect upon her health and happiness, as well as upon her future relations with her parents. From the body of testimony on this point, we will make certain citations from the testimony of Dr. Foye. The latter is an accomplished physician, who has treated both the mother and the child, and knows their temperaments and dispositions and physicial limitations.

Speaking of the mother, this witness said: "She is a highly nervous woman, a neurasthenic." The following questions and answers are from Dr. Foye's testimony:

"The Court: What would be the effect, in your opinion, in your medical opinion, of returning this child now to Tennessee?

"The Witness: With the history of the child and what I know of her and her condition in the past, and what I know of the mother and her condition over a period of some years, I would say, if she were my child, I would not want her to go.

"The Court: Let me ask a question here. Do you mean by that that it would simply be more desirable that she should remain here?

"A. I would say that it would be very much more desirable for the child to remain away from her mother.

"Q. When you say 'desirable,' from what point of view?

"A. From the health standpoint. That is the only point I am here on.

"Q. I am only talking to you now as a doctor.

"A. Well, I thought I covered that in my answer. I certainly would think that with her grandparents she is in a much more desirable surrounding in every way, with the love and affection that they bestow upon her, which she in turn gives to them.

"Q. I am going to ask you if you have been able to determine whether or not the child reposes a trust and confidence in her grandparents?

"A. I know that absolutely. I know that from her."

Speaking of the child's condition at the time she gave the foregoing testimony, the witness in response to a question by the court said: "She is not a strong child now, but she is much better than I have ever seen her. She had a bad heart murmur, what we call a hasmic murmur, and

that has disappeared. Her chest is not fully developed now, but it will be. She has much more flesh on her, and she has certainly grown larger, taller and stronger."

There is some very striking evidence in the record in the form of affidavits, showing the serious effect upon Susan Ish of the nervous strain caused by the possibility of her enforced return to Tennessee. One of these affidavits concludes with the following sentence: "She continually weeps, and is constantly harassed by her own fears that she may be forced to return. She, at present, is a spectacle to move a heart of stone." The court declined to receive or consider these affidavits as to the condition of the child subsequent to the public hearing, stating that "he had anticipated, or foreseen, the condition of the child as described in said affidavits."

Evidently the trial court did not consider that the effect of removing Susan Ish to a new environment would be seriously to the prejudice of her health or happiness. He must have regarded her condition as described in the affidavits which he declined to receive as merely the temporary effect of fleeting childish emotions. Nor does he seem to have attached much importance to the evidence as to her nervous temperament, her nervous sensitiveness, the fluctuations in her health attendant upon her trips to Tennessee, the strength of her attachment for her grandparents, and her positively expressed wish to remain in Virginia. We have no disposition to challenge the general rule of law which entitles the father to the custody of a child, or to deny that in most instances it will be found that the legal rights of parents and the interest of the child are the same. Where the parents are worthy and the child is of tender years, the courts can deliver custody with much confidence as to the result of such action. Children of this age will react to new surroundings and adjust themselves to new conditions.

The childish memories will soon grow dim. But not so when dealing with a child of maturer years and more fixed affections, coupled with a somewhat unusual temperament. If the interests of such a child are to be the polar star of our action, we are not prepared to say that such interests will be advanced by projecting her by compulsion of law into a new environment. So far from advancing these interests, such action may permanently embitter the child's relations to its parents, and change the whole current of its life. Should she pine for the old home and fail to grow into the new, the parents will in time come to resent that attitude, and a wall will be established between them and their child. Should we order a child of almost sixteen to be delivered to her parents, and she refuse to go with them, what then? Shall they take her by force, or should the officers of the law be called to the aid of the parents to effect delivery of custody? Such action would furnish a sorry presage of future happiness for the parties concerned.

This case can be decided without disparaging comment upon the motives, or conduct, of any of the parties concerned. We need not search the record to find ground of criticism for the conduct or attitude of the grandparents, or of the parents. The attitude of the parents is natural and reasonable. The grandparents are not seeking to separate father and child. They rest their case upon the interests of the child. They consider that they have what they style a moral right to consideration, but however strong that claim may be, this court cannot rest its decision upon such a foundation. Such moral claims do not furnish a right in law to the custody of a child. The parents on their part must win their child by an appeal to her affections. She must go to them by the promptings of filial duty. Her natural home is with her parents, and she should

not regard the home of her grandparents as her permanent abiding place. But the child is old enough to act on her own volition, and have her decision regarded. We feel sure that if the parties concerned will approach a solution of the present unhappy situation in a spirit of mutual forbearance and affection, forgetting the things of the past, a happy reconciliation and a lasting composition of their troubles will be secured.

But after a careful consideration of all of the voluminous evidence in this case, having in mind the interests of all concerned, and the primary interest of the child, we cannot concur with the action of the trial court, that such interest will be promoted by delivery of the custody of Susan Ish to her father. The order of the Circuit Court of Prince William county will be reversed, and this proceeding is remanded to that court with directions to keep the same on the docket for such further orders as may prove to be necessary.

The child, Susan Ish, may elect at any time whether she will go to her parents, or remain with her grandparents. Should she elect to go to her parents, the *habeas corpus* proceedings shall be dismissed. Should she elect to remain for the present with the grandparents, she must advise the court to that effect, and said court shall thereupon provide by order that the grandparents shall afford the parents full and free opportunity to visit and confer with their child, and shall not in any wise interfere with any plan, or purpose, on the part of the child to visit or make her home with her parents.

*Reversed and remanded.*