ROSS ET UX. *v.* PICK

[No. 101, October Term, 1951.]

*Decided February 14, 1952.*

*Rehearing denied March 13, 1952.*

344

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*George E. Brown, Jr.,* and *Howard E. DeMuth, Jr.,* for the appellants.

*Francis J. Valle,* with whom was *George W. Della* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This is a controversy over the right to the custody of William R. Dick, 11-year-old son of Robert L. Dick and his former wife, Helen R. Dick, now Helen R. Pick. The mother's petition for custody of her son was opposed by appellants, Alfred W. Ross and Mary Elizabeth Ross, his wife, formerly residents of West Virginia, but now of Dundalk, Baltimore County, who had his custody for nearly ten years.

The Dicks were married in 1937. At that time Mrs. Dick was 17 years old. The couple had two children, Robert L. Dick, Jr., born in April, 1938, and William R. Dick, born in March, 1940. The conditions under which the family lived were deplorable. Dick was an habitual alcoholic who spent most of his salary for liquor. It was reported that when Mrs. Dick arrived home one night, she found that her husband had sold all of their possessions except the bedroom furniture and the kitchen stove. It was also reported that when Mrs. Dick was pregnant before William's birth, she did not have enough

food to eat, and in consequence the child was so punny at birth that he was left in the hospital for about a month for observation. In January, 1942, Dick took the two children to Elk Garden, a village with a population of about 300 in Mineral County, West Virginia, to confer with his sister and her husband, the Rev. George Burkhardt. The Burkhardts promptly took the children to the home of their daughter and her husband, appellants, in Cresaptown, Allegany County, Maryland. In April, 1942, after Mrs. Dick got a job at a luncheon counter, Dick made a trip to Cresaptown to reclaim the boys, but he brought only Robert back to Baltimore. In the Summer of 1943 Mrs. Dick went to Cresaptown to bring William back. She stayed with the Rosses overnight, but they told her that she could not take William unless she had her husband with her.

The Dicks separated in November, 1943. Dick instituted a suit for divorce in the Circuit Court of Baltimore City. Mrs. Dick filed a cross-bill. In January, 1945, the Court granted Mrs. Dick a divorce, awarded her the custody of Robert and ordered her husband to pay $6 a week for his support, and reserved the matter of William's custody for the future action of the Court.

In 1946 Mrs. Dick married Charles Wood, a ship worker. In November, 1948, Wood was killed while working on a ship at the Maryland Dry Docks. In July, 1949, Mrs. Wood married Charles W. Pick, a native of Scotland 28 years old, a first class petty officer in the Navy. In February, 1951, Mrs. Pick filed a petition in the divorce proceedings in the Court below asking for the custody of her son William.

Mrs. Pick's first husband, the father of the child, did not answer the petition. Mr. and Mrs. Ross answered that they had adopted the child in West Virginia. Ross had served in the United States Navy for several years, but received his discharge in February, 1946. In October, 1946, accompanied by his wife and the boy, he went to Green Lane, Pennsylvania, to attend the Eastern Bible Institute. They returned to Elk Garden in January,

1948. In July, 1948, the Rosses filed a petition in the Circuit Court of Mineral County, West Virginia, for the adoption of the child. From January until April, 1949, Ross attended a business school in Cumberland, and his wife and the child lived with him in that city. On May 16, 1949, the Circuit Court of Mineral County found that the child's father consented to adoption, and that the child's mother had abandoned and deserted him for a period of more than seven years and had shown no interest in his welfare, and accordingly decreed that he was the adopted son of Mr. and Mrs. Ross. In May, 1949, they moved to Dundalk, where they have since resided.

At the conclusion of the testimony, the Court announced that, in accordance with recommendations of the Probation Department, the Rosses would be given custody of the boy during the sessions of school, while Mrs. Pick would have his custody in Summer and at weekends, so that after the boy reaches the age of 15 and is able to make up his mind, he can decide for himself with whom he wants to live. Shortly after announcing that decision, the Court was informed that Pick had been ordered to Florida and that Mrs. Pick planned to follow him. That change of residence made it impracticable to carry out the recommendations of the Probation Department. On July 10, 1951, the Court awarded the sole care and custody of the child to Mrs. Pick.

In any divorce case in Maryland in which the care and custody of the children of the parties forms a part of the relief prayed, the court has the power to order who shall have the guardianship and custody of the children and be charged with their support and maintenance, and may at any time thereafter annul, vary or modify such order in relation to the children. Code 1939, art. 16, sec. 41, as amended by Laws 1949, ch. 370; *Sause v. Sause,* 194 Md. 76, 69 A. 2d 811; *Chillemi v. Chillemi,* 197 Md. 257, 78 A. 2d 750; *Bennett v. Bennett,* 197 Md. 408, 417, 79 A. 2d 513.

Mrs. Pick earnestly contended that the West Virginia court lacked jurisdiction in the adoption proceedings for two reasons: (1) that the child's domicil was in Maryland, and (2) that she had no actual notice of the adoption proceedings.

The West Virginia Code of 1949 contains the following provisions on the subject of adoption:

Sec. 4756. "Such petition shall set forth the name, age and place of residence of the petitioner or petitioners, and of the child * * *; whether such child has either father or mother, or both, and if he, she or they are alive, then the name or names, and place of residence of such father or mother, or if such be the fact, that the same are unknown to the petitioner or petitioners."

Sec. 4757. "Upon the day so appointed the court or judge thereof shall proceed to a full hearing of the petition and examination of the parties in interest, under oath and of such other witnesses as the court or the judge thereof may deem necessary to fully develop the standing of the petitioners and their responsibility, and the status of the child sought to be adopted * * *."

Sec. 4760. "A parent or guardian of a minor, when a minor is adopted under the provisions of this article, who had no notice of the proceedings, may, at any time within a year after receiving notice thereof, apply by petition to the circuit court in which the petition * * * was filed, praying that the adoption may be vacated."

The decree of the West Virginia court must be given full faith and credit under Article 4, Section 1, of the Constitution of the United States. *Smithsonian Institution v. St. John*, 214 U. S. 19, 29 S. Ct. 601, 603, 53 L. Ed. 892. However, the Full Faith and Credit Clause does not preclude inquiry into the jurisdiction of the court in which the judgment is rendered over the subject matter, or the parties affected by it, or into the facts necessary to give such jurisdiction. Complete inquiry is permissible into the circumstances of a judgment of a sister State to determine whether it binds the person

against whom it is invoked. *Thormann v. Frame,* 176 U. S. 350, 20 S. Ct. 446, 448, 44 L. Ed. 500.

It is well settled that a decree of adoption has all the force and effect of a judgment and is not subject to collateral attack except for want of jurisdiction. *Villier v. Watson,* 168 Ky. 631, 182 S. W. 869, L. R. A. 1918 A, 820; *Milligan v. McLaughlin,* 94 Neb. 171, 142 N. W. 675, 46 L. R. A., N. S., 1134; *Furgeson v. Jones,* 17 Or. 204, 20 P. 842, 3 L. R. A. 620. It is generally held that, unless a parent has forfeited his rights in relation to his child by some misconduct, he is entitled to notice of proceedings to adopt it, and, in the absence of such notice, the proceedings are invalid as against the parent. *Lacher v. Venus,* 177 Wis. 558, 188 N. W. 613, 24 A. L. R. 403, 416. The interest of a parent in his child cannot be divested by adoption unless he is given notice and an opportunity to be heard, except in instances where by gross misconduct, or waiver, or perhaps for other fault, he has forfeited his rights in this respect. The Legislature has wide discretion in determining the acts or conduct of a parent which may forfeit this right to notice or dispense with it, for the Legislature has power to enact reasonable legislation to provide for the care, custody and maintenance of children within its borders. *Glass v. Glass,* 260 Mass. 562, 157 N. E. 621, 53 A. L. R. 1157.

It is true that a minor child's domicil, in the case of divorce of its parents, is that of the parent to whose custody it has been legally given; and if there has been no legal fixing of custody, its domicil is that of the parent with whom it lives; but if it lives with neither, it retains the father's domicil. *Restatement, Conflict of Laws,* sec. 32. But it is also accepted that the status of adoption is created by either (1) the law of the State of domicil of the adopted child, or (2) the law of the State of domicil of the adoptive parent, if it has jurisdiction over the person having legal custody of the child, or if the child is a waif and subject to the jurisdiction of the State. *Restatement, Conflict of Laws,* sec. 142.

In *Stearns v. Allen*, 183 Mass. 404, 67 N. E. 349, 351, 97 Am. St. Rep. 441, the Supreme Judicial Court of Massachusetts had under consideration the Massachusetts statute which provided that the consent of parents to the adoption of their child shall not be required in certain cases of imprisonment of the parent, or of willful desertion of the child by the parent, or if the parent has suffered the child to be supported for more than two years continuously by a charitable institution or as a pauper, or if he has been convicted of being a common drunkard and neglects to provide proper care and maintenance for the child, or if he has been convicted of certain other offenses, and is guilty of such neglect. Chief Justice Knowlton said in that case: "So far as the adopting parents are concerned, the change cannot be made without their consent. So far as an infant child is concerned, the state, as his protector, may make the change for him. The natural parents of the child should be considered and their natural rights should be carefully guarded; but their rights are subject to regulation by the state, and, if these come in conflict with the paramount interests of the child, it is in the power of the state, by legislation, to separate children from their parents when their interest and the welfare of the community require it. * * * If the child is actually dwelling in the state, although its father's domicile is elsewhere, the state may as well provide for his adoption as to provide for him in other ways. * * * From the necessity of the case, inasmuch as it has not always been possible to find all the interested parties in the same state, it is enough to establish jurisdiction which is binding upon the natural parent if he is given reasonable notice of the pendency of the proceedings, and an opportunity to be heard * * *. We are of opinion that if the child is an inhabitant of the commonwealth—especially if the father has abandoned him and his mother also lives here—the mere fact that his father's domicile is in another state or country does not deprive the court of jurisdiction under our statute."

The West Virginia adoption statute does not expressly require actual notice to a divorced parent, to whom custody has not been given by the divorce court. But the statute does not in terms dispense with such notice. It is not necessary on this appeal to decide whether the fact that the child's mother received no actual notice of the adoption proceedings in West Virginia deprived the Court of jurisdiction and rendered the decree void as to her. As the fitness of appellants to retain custody of their adoptive child has not been questioned, we could not affirm the order before us unless we should find the West Virginia statute void. On the other hand, if we should find no facts which warrant us in disturbing appellants' custody, even in the absence of adoption, again we could not affirm the order. Appellants have not asked for any affirmative relief. They ask only that Mrs. Pick's petition be dismissed. The question of the validity of the decree of adoption involves questions of statutory construction, which have not been answered by the West Virginia Supreme Court of Appeals. It is not desirable to construe a statute of another State before it has been construed by the highest Court of that State, unless a construction is unavoidable. For the purposes of this appeal we assume that there has not been a valid adoption of the child, as though the question were only one of custody unaffected by any question of adoption. This is merely an hypothesis, which in any proceeding must be supplanted by a definite finding on the question of adoption before appellants' custody may be disturbed. We make no intimation that the adoption decree is void, but we decide the case on the ground that it is for the best interests of the child that he be left in the custody of appellants.

At common law in England the father had virtually an absolute right to the custody and control of his minor children, which arose from his obligation to support, protect and educate them. In this State the father and mother are the joint natural guardians of their minor

child and are equally charged with its care, nurture, welfare and education. Code 1939, art. 72A, sec. 1. Moreover, while the parents are ordinarily entitled to the custody of their minor children by the natural law, the common law, and the statute, this right is not an absolute one, but may be forfeited where it appears that any parent is unfit to have custody of a child, or where some exceptional circumstances render such custody detrimental to the best interests of the child. Code 1939, art. 16, sec. 85; *Burns v. Bines,* 189 Md. 157, 162, 55 A. 2d 487, 57 A. 2d 188. In a contest over the custody of a child, the right of either parent is ordinarily superior to that of anyone else, but the welfare of the child is the paramount consideration for the guidance of the court. *Sibley v. Sibley,* 187 Md. 358, 362, 50 A. 2d 128. This principle is based upon the theory that, while the law of nature gives to parents the right to the custody of their own children, a child from the time of birth owes allegiance to the State, and the State in return is obligated to regulate the custody of the child whenever necessary for its welfare.

Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary. *Risting v. Sparboe,* 179 Iowa 1133, 162 N. W. 592, 594, L. R. A. 1917 E, 318; *Wilson v. Mitchell,* 48 Colo. 454, 111 P. 21, 26, 30 L. R. A., N. S., 507, 512. In determining what is for the welfare of the child, the court considers the training, development, morals and happiness of the child. *Maddox v. Maddox,* 174 Md. 470, 477, 199 A. 507; *Piotrowski v. State,* 179 Md. 377, 382, 18 A. 2d 199.

An important feature of this case is that appellants had the care and custody of the child from the time he was less than two years old until he was over eleven. Where a child has been left by its parents in the care and custody of others, but the parents reclaim it soon

afterwards, and the parents are competent to have its custody, the court gives more weight to the law of nature, which recognizes the force of parental affection, than to the probability of benefit to the child by leaving it where it is, even the probability of advantages which wealth and social position might bestow. But where the parents surrender complete custody of an infant for such a long time that its interests and affections all attach to the persons who fill the place of the parents, and the infant develops into a healthy and happy child, then if the parents seek to reclaim the child by judicial decree, the court should place the right of the parents subordinate to the right of those who performed the parental duties, for the ties of companionship strengthen by lapse of time, and upon the strength of those ties the welfare of the child largely depends. *Dietrich v. Anderson*, 185 Md. 103, 118, 43 A. 2d 186; *Richards v. Collins*, 45 N. J. Eq. 283, 17 A. 831; *Chapsky v. Wood*, 26 Kan. 650, 40 Am. Rep. 321, 323.

We find no sufficient reason to justify the action of the Court in taking the child from appellants. They have been happily married for more than twelve years. They have provided support and education for the child and have given him their affection. When they took him in their home in Allegany County ten years ago, he was in a pathetic physical condition. Ross testified as to his appearance in 1942 as follows: "The child looked to me to be on the verge of a rickets condition. His arms and legs were thin. His head seemed to be a little abnormal, large for a child of his age. And his stomach seemed to be swollen to an extent, suffering from malnutrition." On examination by a physician prior to the trial, his general physical condition was found to be good. Ross now has a permanent position with Sears Roebuck & Company as collection manager, and thus is able to continue to support the child. He testified that the boy's regular attendance at church and Sunday School had developed in him a desire to become a minister. In contrast, there was evidence

that Mrs. Pick had no interest in church, and had been intoxicated on several occasions. Moreover, as Pick is a sailor, there is no prospect of a permanent home, such as the Rosses can now provide.

Finally, in determining in a contest for custody what will promote the best interests of the child, the child's own wishes may be consulted and given weight if he is of sufficient age and capacity to form a rational judgment. There have been occasional references to an English rule that "the wishes of a child under the age of nurture, which is 14 years, are not to be consulted as to its custody against the claim of its guardian by nurture." *Ex parte Reynolds,* 73 S. C. 296, 53 S. E. 490, 493, 114 Am. St. Rep. 86. But we adopt the rule that there is no specific age of a child at which his wishes should be consulted and given weight by the court. The matter depends upon the extent of the child's mental development. The desires of the child are consulted, not because of any legal right to decide the question of custody, but because the court should know them in order to be better able to exercise its discretion wisely. It is not the whim of the child that the court respects, but its feelings, attachments, reasonable preference and probable contentment.

Appellants asserted that the child is devoted to them and earnestly desires to live with them. They have stated, however, that they decided to refrain from putting him on the witness stand at the trial on account of the fact that he is sensitive and emotional, and they considered it prudent to avoid subjecting him to any more emotional strain than he had already undergone. They stated that they requested the chancellor several times to talk with the boy in private in order to ascertain his feelings and desires, but the chancellor refused to do so. Of course, the desire of a child is not controlling upon the court. In the case of a very young child it may be totally disregarded. However, where the child is able to form a rational judgment, its desire should be given special consideration where the parents

354

have voluntarily allowed it to live in the family of others for a considerable length of time, and thus form home associations and ties of affection for those having its care and nurture, and where it would jeopardize its health or mar its happiness to sever such ties. As the child in this case was over 11 years old and was unusually intelligent, his desire was entitled to some consideration. *Hutchinson v. Harrison*, 130 Va. 302, 107 S. E. 742; *Stapleton v. Poynter*, 111 Ky. 264, 62 S. W. 730, 53 L. R. A. 784.

After a thorough investigation of this case, the Probation Department expressed the opinion, based upon the advice of a physician, that abrupt removal of the child from appellants would probably have an injurious effect upon his personality and social growth. The Court nevertheless ordered the child to be taken from them and given to Mrs. Pick.

On the hypothesis most favorable to Mrs. Pick, *i.e.*, that there has been no valid adoption of the child, we have found no facts which warrant an order disturbing appellants' custody. We find it imperative, therefore, to reverse the order.

*Order reversed and petition dismissed, with costs.*