754 A.2d 1087

Donna GESTL

v.

Lisa M. FREDERICK, et al.

No. 1231, Sept. Term, 1999.

Court of Special Appeals of Maryland.

July 3, 2000.

Cynthia E. Young, Annapolis, and Shannon Minter, San Francisco, CA, for appellant.

Theresa A. Furnari, Towson, for appellee.

Argued before ADKINS, ROBERT F. FISCHER (Retired, Specially Assigned) and H. KEMP MacDANIEL (Retired, Specially Assigned), JJ.

ADKINS, Judge.

We must decide in this appeal whether the State of Maryland is the proper forum to hear a child custody dispute under the Uniform Child Custody Jurisdiction Act. Donna Gestl, appellant, argues that the Circuit Court for Baltimore City erred in dismissing her child custody dispute against Lisa Frederick, appellee. Appellant raises two issues on appeal, which we have rephrased slightly:

I. Whether the trial court erred in declining jurisdiction because Maryland was an inconvenient forum.

II. Whether the trial court erred in dismissing the case rather than staying the proceedings.

## FACTS[1] AND LEGAL PROCEEDINGS

Appellee is the biological mother of a child with many special needs.[2] According to appellee, the child "has been evaluated. as developmentally delayed, speech and learning disabled, Attention Deficient Hyperactivity disorder and autistic like disorder."

While pregnant with the child in November 1992, appellee moved from the state of Tennessee to the State of Maryland. The child was born in Maryland on March 13, 1993. At some point, the parties became involved in an intimate relationship and appellee and the child moved into appellant's home in July 1993.

---

1. The parties' respective factual claims were set forth in the complaint, motion to dismiss, opposition to same, and affidavits filed in support of the motion and opposition.

2. The child's biological father, Philip Sparn, was named as a defendant in the circuit court action. Sparn never entered an appearance and the evidence indicates that he has had little or no contact with the child. Sparn currently resides in the State of Tennessee.

The parties dispute what occurred during the course of their relationship. Appellant alleges that while she was not the child's "biological mother, [she has] been his parent since birth." She asserts that she was appellee's "birthing coach" and was present at the child's birth. She claims she shared parenting responsibilities with appellee and that the two "generally held themselves out to the world as a family unit." Moreover, she alleges that her family saw the child on a regular basis and treated him as a member of their family. She further asserts that appellee "chose a name for [the child] to call [appellant]: 'Mim', a derivative of mom." Finally, she claims that she assumed primary financial responsibility for appellee and the child.

Appellee, on the other hand, alleges that appellant's "role regarding the child was one of recreation and entertainment." She asserts that the parties never discussed a joint parenting arrangement regarding the child and that appellant never suggested that she would assume financial responsibility for the child. Additionally, appellee claims that she received governmental assistance to meet the child's needs and that appellant insisted she obtain employment, which she did in March 1997. Appellee also asserts that appellant has a violent temper and would argue with her in front of the child and that appellant threatened "to take [the child] away from [appellee] by going to court and alleging she was an unfit mother."

Appellee moved out of appellant's residence in August 1998 and returned to Tennessee. Appellee claims that since moving to Tennessee, she has become employed as a substitute teacher, and "obtained the services of a pediatrician and enrolled the child in a local elementary school which was equipped and staffed to meet [his] special educational needs."

In November 1998, the Tennessee Department of Children's Services ("Department") filed an action against appellee in the Juvenile Court for Anderson County, Tennessee ("Juvenile Court"), seeking custody of the child.[3] In addition, appellee

---

3. On February 9, 1999, the Department and appellee entered into a consent agreement in the Juvenile Court, which stated that the child

filed in the Juvenile Court a petition to establish paternity against Sparn in May 1999.[4]

On December 3, 1998, appellant filed a "Complaint for Joint Legal Custody, Pendente Lite and Permanently, and Visitation and Other Relief" in the circuit court. On March 9, 1999, appellee filed a motion to dismiss asserting, *inter alia:* (1) the court should decline jurisdiction because there was a pending proceeding in Tennessee involving the child and that Maryland was an inconvenient forum; and (2) that appellant lacked standing to pursue the action because appellee "is neither an unfit parent nor do exceptional circumstances exist to overcome the presumption that is it [sic] in the child's best interest to remain with . . . his biological parent."

A hearing on appellee's motion was held on May 27, 1999. At the hearing, the court was presented with evidence of the consent judgment appellee entered with the Department and the petition filed in the Juvenile Court by appellee against Sparn to establish paternity. After the hearing, the trial judge contacted a judge in the Juvenile Court, who indicated that two files existed regarding the child: the custody case filed by the Department on November 18, 1998, and the paternity action that was filed on May 19, 1999. The Tennessee judge indicated that the custody case was closed and the paternity case was pending. Additionally, when asked by the trial judge about what a Tennessee court "might do with a non-blood-related person," the Tennessee judge indicated that "in her view, in Tennessee a non-blood-related person is never given custody unless . . . there could be proof of 'dependency or neglect.' "

On June 21, 1999, the trial court issued a written opinion granting appellee's motion to dismiss. The court found that Maryland did have jurisdiction pursuant to Md.Code (1984,

---

was to be returned to appellee and that appellee "has the ability to provide care, custody of this minor child in an adequate and sufficient manner."

4. The Tennessee paternity action was pending at the time of the circuit court proceedings.

1999 Repl.Vol.), § 9–204(a)(1) of the Family Law Article ("FL"). Nevertheless, the court held that Tennessee was the appropriate forum to hear the dispute because Tennessee was the more convenient and appropriate forum. In so doing, the court explained:

> [T]he great bulk of the contacts, information and expertise concerning the best interest of the child, both presently and in the future, exist in the state of Tennessee. This [c]ourt believes, in accordance with [FL s]ection 9–207(c), that Tennessee has a closer connection with the parties and the child's family, and that virtually all of the personal and professional evidence concerning the child's present and future best interest is in Tennessee.

Additional facts will be added as necessary to supplement the following discussion.

## DISCUSSION

Appellant contends that the trial court erred in declining jurisdiction. She argues that "although [s]ection 9–207 permits a court to decline jurisdiction if it finds that it is an inconvenient forum, both Maryland case law and the plain language of the [Uniform Child Custody Jurisdiction Act] prohibit a court from doing so where the proposed alternative forum is only theoretically available and will not actually hear the case." She contends that Tennessee is not an available alternative forum because Tennessee only recognizes a third party's claim to custody in instances of abuse and neglect. According to her, at the very least, the trial court should have stayed the Maryland proceedings under FL section 9–206(c).

## I.

### The Uniform Child Custody Jurisdiction Act

All fifty states and the District of Columbia have adopted the Uniform Child Custody Jurisdiction Act ("UCCJA"). Maryland adopted the UCCJA in 1975, and it is codified as the

Maryland Uniform Child Custody Jurisdiction Act ("Act"). *See* FL § 9–201 *et seq.*

In *Olson v. Olson,* 64 Md.App. 154, 494 A.2d 737 (1985), Judge Rosalyn Bell explained that the Act is in response to a

'growing public concern over the fact that thousands of children are shifted from state to state and from one family to another every year while their parents or other persons battle over their custody in the courts of several states ... It is well known that those who lose a court battle over custody are often unwilling to accept the judgment of the court. They will remove the child in an unguarded moment or fail to return him after a visit and will seek their luck in the court of a distant state where they hope to find—and often do find—a more sympathetic ear for their plea for custody. The party deprived of the child may then resort to similar tactics to recover the child and this 'game' may continue for years, with the child thrown back and forth from state to state, never coming to rest in one single home and in one community.'

*Id.* at 160, 494 A.2d 737 (quoting UCCJA, 9 U.L.A. Commissioners' Prefatory Note at 111–12 (1968)).

■ The UCCJA controls which state has subject-matter jurisdiction over child custody cases. *See Harris v. Simmons,* 110 Md.App. 95, 102, 676 A.2d 944, *cert. denied,* 343 Md. 680, 684 A.2d 454 (1996). The General Assembly has recognized that the purposes of the Act include avoiding jurisdictional competition and conflict with courts of other states in matters of child custody, promoting cooperation with the courts of other states "to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child," assuring that litigation concerning the custody of a child takes place ordinarily in the state with which the child and the child's family have the closest connection and where significant evidence concerning the child is available, and discouraging continuing controversies over child custody. FL § 9–202; *see also* Tenn.Code Ann. § 36–6–202.

FL section 9–204 sets forth the grounds when Maryland courts may exercise jurisdiction. It provides, in pertinent part:

(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial decree or modification decree if:

(1) this State (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this State because of the child's removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this State[.]

FL § 9–204. Tennessee has similar jurisdictional requirements. *See* Tenn.Code Ann. § 36–6–216.

■ Home state is defined as:

the state in which the child, immediately preceding the time involved, lived with the child's parents, a parent, or a person acting as parent, for at least 6 consecutive months, and in the case of a child less than 6 months old, the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the 6–month or other period.

FL § 9–201(f). Generally, a "home state" should be the jurisdiction to hear and decide custody disputes. *See Olson*, 64 Md.App. at 162, 494 A.2d 737. "If, however, 'there is no home state or the child and his family have equal or stronger ties with another state, a court in that state has jurisdiction.' " *Id.* at 162–63, 494 A.2d 737 (quoting 9 U.L.A. Commissioners' Note § 3 at 123).

■ We agree with the trial court that Maryland was the home state of the child and that Maryland has jurisdiction. The undisputed evidence indicates that the child lived in Maryland since his birth and that appellee removed him from Maryland in August 1998. Appellant's petition was filed on December 3, 1998. The child had been absent from Maryland for less than six months at the time the petition was filed.

Therefore, Maryland courts do have jurisdiction under the Act as the child's home state. Nevertheless, "[o]ur inquiry does not end here ... because we must further determine whether Maryland is precluded from exercising jurisdiction" under FL sections 9–206 or 9–207. *Id.* at 163, 494 A.2d 737.

### A.

### FL section 9–206

■ FL section 9–206(a) provides:

*When other state more appropriate.—* ... a court of this State shall not exercise its jurisdiction under this subtitle if, at the time of filing the petition, a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this subtitle, unless the proceeding is stayed by the court of the other state because this State is a more appropriate forum or for other reasons.

FL § 9–206(a). A court in this State is required to "examine the question of the pendency of proceedings elsewhere in Maryland or in other jurisdictions and should do so of its own motion even if the issue is not raised by the parties themselves." *Paltrow v. Paltrow,* 37 Md.App. 191, 197, 376 A.2d 1134 (1977), *aff'd,* 283 Md. 291, 388 A.2d 547 (1978); *see* FL § 9–206(b).

■ If a proceeding is pending in another jurisdiction, a Maryland court usually must decline to exercise its jurisdiction. *See Malik v. Malik,* 99 Md.App. 521, 526, 638 A.2d 1184 (1994). " 'Pending' means that a case has been filed and is not concluded." John F. Fader II & Richard P. Gilbert, *Maryland Family Law,* § 9–4(c) at 416 (2d ed.1995).

■ Pursuant to FL section 9–206(b), the trial judge examined the information provided by the parties and contacted a judge in Tennessee to inquire about the pendency of any proceedings. In doing so, the trial judge discovered that the Department's custody case against appellee was filed on November 18, 1998. Based on this finding the court held it

"should decline jurisdiction based on there being a prior, then open case in the state of Tennessee."

■ The trial court, however, failed to take into account that the Tennessee custody case had been closed by the time of the hearing on appellee's motion. Because the Tennessee custody action was closed, there was no custody dispute "pending" in another jurisdiction.[5]

## B.

### FL section 9–207

The trial court ultimately based its decision that Tennessee was the more appropriate forum to hear this custody dispute because "the great bulk of contacts, information and expertise concerning the best interest of this child both presently and in the future, exist in the state of Tennessee." Appellant contends that the trial court erred because, as a third party, she does not have standing to seek custody in Tennessee. She argues that, at the very least, the trial court should have stayed the Maryland proceedings instead of dismissing the case outright.

■ FL section 9–207(a) provides:

*Action if this State is inconvenient forum.*—A court which has jurisdiction under this subtitle to make an initial decree or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.

Factors a trial court should consider in determining whether it is an inconvenient forum include:

---

5. Further, we note that the action against Sparn to establish paternity was not filed until May 19, 1999, after the initiation of proceedings in the circuit court. In any event, an action to establish paternity is not an action for custody as contemplated by the UCCJA. *See* FL § 9–206(a) (Maryland courts should not exercise jurisdiction when "a proceeding concerning the *custody* of the child [is] pending in a court of another state.") (Emphasis added).

(1) if another state is or recently was the child's home state;

(2) if another state has a closer connection with the child and the child's family or with the child and 1 or more of the contestants;

(3) if substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

(4) if the parties have agreed on another forum that is no less appropriate; and

(5) if the exercise of jurisdiction by a court of this State would contravene any of the purposes stated in [FL section 9–202].

FL § 9–207(c). Additionally, if a trial court finds that it is an inconvenient forum, "it may stay the proceedings on condition that a custody proceeding be promptly commenced in another named state or on any other conditions which may be just and proper...." FL § 9–207(e). We will not disturb a trial court's decision whether or not to exercise jurisdiction unless the trial court abuses its discretion. *See Harris v. Melnick,* 314 Md. 539, 557, 552 A.2d 38 (1989) (affirming the circuit court's decision to exercise jurisdiction even though Colorado was child's home state when the father continued to reside in Maryland, original custody decree was entered in Maryland, and there was no indication that Colorado would exercise its jurisdiction).

This Court has addressed the application of FL section 9–207 in a number of cases. In *Cronin v. Camilleri,* 101 Md.App. 699, 648 A.2d 694 (1994), the wife moved with her children to Hawaii after her daughter complained of sexual abuse by her father, the wife's husband. In a Hawaii court, she filed an "Ex Parte Petition for a Temporary Restraining Order for Protection and Statement" against the husband. *Id.* at 701, 648 A.2d 694. The husband thereafter filed a complaint for a limited divorce and custody in a Maryland circuit court.

The circuit court declined to exercise jurisdiction on the grounds that the Hawaii proceeding was the initial proceeding

under FL section 9–206 and that Maryland was an inconvenient forum under FL section 9–207. In affirming the trial court's decision that Maryland was an inconvenient forum, we held:

The record fully supports each of the following findings of fact announced by [the trial court]: (1) the children had a substantial number of relatives in—and a closer connection to—Hawaii, (2) the initial custody proceeding was filed in Hawaii, (3) [the wife] had the ability to earn a living in Hawaii, but not in Maryland, and (4) significant evidence concerning the child's care, protection, training, and personal relationships is readily available in both states.

*Id.* at 708, 648 A.2d 694.

We reached a similar result in *Solomon v. Solomon,* 118 Md.App. 96, 701 A.2d 1199 (1997). The parties in *Solomon* resided in Maryland during their marriage and their child was born in Maryland. The family moved to New York so that the husband could "complete a one-year fellowship at a hospital in Manhattan" and then moved to Switzerland. *Id.* at 100, 701 A.2d 1199. While living in Switzerland, the mother and child returned to New York and the mother filed an action for divorce that was dismissed for lack of jurisdiction. The husband subsequently filed an action for divorce in the Maryland circuit court, which was granted. By agreement, the mother, who continued to reside in New York, maintained physical custody, while the father, who had returned to Maryland, was granted visitation.

After the divorce, the parties appeared in a Maryland circuit court on a number of occasions and eventually the father filed a request to modify visitation. The wife responded by filing an action in a New York court to modify the divorce judgment and to dismiss the circuit court action filed by the father, claiming that the Maryland court "was an inconvenient forum to make custody and visitation determinations and that ... New York is a more appropriate forum." *Id.* at 102, 701 A.2d 1199. The New York court stayed its proceedings pending the result of the wife's motion in Maryland.

We held that the trial court did not abuse its discretion in ruling that, although Maryland had jurisdiction,[6] Maryland was an inconvenient forum because

> the most convenient forum is New York.... [The child's] home state is New York and ... New York has a closer connection with [the child] than Maryland.... [T]here is substantial evidence concerning [the child's] 'present or future care, protection, training, and personal relationships' in New York.... [The child's] rabbi, guidance counselor, doctors, teachers, dentist, and maternal relatives are located in New York. The court observed that [the child] interacts with classmates and friends, attends camp, and sees his maternal grandmother three to four times a week.

*Id.* at 108, 701 A.2d 1199.

■ Based on the factors outlined in the above cited cases and considering the facts developed in this case, we find that the trial court was not clearly erroneous in its determination that Tennessee was the more convenient forum. Appellee currently resides with the child in Tennessee. She has found gainful employment in Tennessee. Moreover, the trial court correctly noted "it appears that the professionals who are now involved in his present care ... are physically present in the state of Tennessee, including his present doctor, teachers and pediatrician." Finally, the natural father resides in Tennessee.

## C.

### Lack of an available alternative forum

Appellant claims that even if Tennessee is the more appropriate forum, the trial court erred in dismissing the instant

---

6. We found Maryland had jurisdiction under FL section 9–204(a)(2), which provides that Maryland has jurisdiction when

 it is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and the child's parents, or the child and at least 1 contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]

case because Tennessee is not available to her as an alternative forum because in a contest between a parent and non-parent, a parent cannot be deprived of custody absent a finding of substantial harm to the child. *See Bond v. McKenzie*, 896 S.W.2d 546, 548 (Tenn.1995).

The Court of Appeals has recognized that a Maryland court should not dismiss an action under the doctrine of forum non conveniens when an alternative forum is not available. In *Johnson v. G.D. Searle Co.*, 314 Md. 521, 552 A.2d 29 (1989), plaintiffs, who were residents of Illinois, instituted a products liability action against a corporation whose "principal office is in Skokie, Illinois . . . [and] maintain[ed] no office in Maryland." *Id.* at 524, 552 A.2d 29. The trial court dismissed the action because Illinois was the more convenient forum.

Although the Court of Appeals held that the trial court did not abuse its discretion in concluding that Illinois was the more convenient forum, it found that the trial court erred in dismissing the action because "limitations have probably run against the [plaintiffs'] claims under Illinois law. . . ." *Id.* at 529, 552 A.2d 29. Quoting from the Restatement (Second) of Conflicts of Laws (1971), the Court explained that a case should not be dismissed "unless a suitable alternative forum is available to the plaintiff. . . . [T]he suit will be entertained, no matter how inappropriate the forum may be, if the defendant cannot be subjected to jurisdiction in other states." *Id.* at 530, 552 A.2d 29 (quoting Restatement, § 84, cmt. c).

Maryland courts have not addressed the interplay between FL section 9–207 and the requirement that an alternative forum exist. In support of her position, appellant has cited cases in which other states under the UCCJA have exercised jurisdiction based on the lack of an available alternate forum. In *Priscilla S. v. Albert B.*, 102 Misc.2d 650, 424 N.Y.S.2d 613 (1980), a child's second cousin filed an action in a New York court, seeking custody from the child's adoptive father. The child's home state was Vermont, but at the time, the child resided with the cousin in New York. The adoptive father subsequently sought and obtained an order from a Vermont court granting him custody. In addressing a claim that New

York was an inconvenient forum, the New York judge contacted the Vermont court, which "indicate[d] that this petitioner, as the child's second cousin, ha[d] no standing to petition any of the Vermont Courts for her custody." *Id.* at 619. "The only procedure which appear[ed] to be available [in Vermont was] a proceeding in the District Court based upon the abuse, neglect or delinquency of the child." *Id.* Conversely, the cousin would have standing to pursue the claim under New York law.

Based on this finding, the court held that an available alternative forum did not exist and refused to dismiss the case based on Vermont being a more convenient. forum. In so doing, the court reasoned that it "will not exercise its discretion to defer to the jurisdiction of the Vermont Court on the basis of forum non conveniens, as the proposed procedure does not assure 'that jurisdiction will be exercised by the most appropriate court and that a forum will be available to the parties.' " *Id.* (quoting New York Domestic Relations Law 75–H(4)).

Relying on *Priscilla S.*, the Court of Appeals of New Mexico held that the trial court did not err in retaining jurisdiction in a custody dispute between a biological mother and a former domestic partner. *See Barnae v. Barnae*, 123 N.M. 583, 943 P.2d 1036, 1041 (Ct.App.) *cert. denied,* 123 N.M. 446, 942 P.2d 189 (1997). In *Barnae,* a biological mother, her two children, and her former domestic partner resided together in California for a number of years. After the relationship with the partner ended, the biological mother moved with the children to New Mexico. The partner then filed an action in New Mexico seeking custody. In response, the biological mother returned to California and initiated a proceeding "seeking a determination of parental relationship and child custody there." *Id.* at 1038. At the time, California did not grant standing to domestic partners who are not biological parents to claim parental rights, *see id.* at 1038–39 (citing *Nancy S. v. Michele G.*, 228 Cal.App.3d 831, 279 Cal.Rptr. 212, 215 n. 2 (1991) and *Curiale v. Reagan,* 222 Cal.App.3d 1597, 272 Cal. Rptr. 520, 522 (1990)), while New Mexico "has held that a

person in a situation similar to [the partner] made a colorable claim of standing to assert a legal right to some type of continuing relationship with the child." *Id.* at 1039 (citing *A.C. v. C.B.*, 113 N.M. 581, 829 P.2d 660, 665 (Ct.App.), *cert. denied*, 113 N.M. 449, 827 P.2d 837 (1992) (holding that non-biological parent who had formally resided with biological mother and child who alleged co-parenting agreement and agreement settling claims of timesharing and custody made prima facie case for relief)).

The court held that the trial court did not err in finding that there was no available alternative forum other than New Mexico. The court reasoned that

the fact that California courts at the very least do not grant standing to persons in [the partner's] position means that the California courts are closed to her....

Here again, but for the fact that [the partner's] lack of standing to assert any parental rights in California foreclos-ed the possibility of another proceeding, the factors usually considered [in addressing whether a forum is the most convenient] favor California. However, the lack of standing in California deprives the parties of an adequate alternative forum in which to resolve the custody dispute.

*Id.* at 1041.

 We agree with appellant that circumstances arise when this State must exercise jurisdiction because another state does not offer an available alternative forum. The question is whether the law of Tennessee lacks conformity with Maryland law to the point that Maryland courts must exercise jurisdiction.

## II.

### Comparison of custody and visitation laws in the States of Maryland and Tennessee

#### A.

#### Custody

 The Supreme Court of Tennessee has recognized that the Tennessee Constitution guarantees a right to privacy,

which includes the right of a parent to care for his or her child. *See In re Askew,* 993 S.W.2d 1, 3 (Tenn.1999). Thus, in a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding ... of substantial harm to the child. Only then may a court engage in a general 'best interest of the child' evaluation in making a determination of custody. *Bond,* 896 S.W.2d at 548.

During the time period between the circuit court's dismissal of the instant case and this appeal, the intermediate appellate court in Tennessee has held that a non-biological "parent" in a domestic relationship was not entitled to custody or visitation of a child. *See In re Thompson,* 11 S.W.3d 913 (Tenn.Ct.App. 1999). The court reasoned that a non-biological parent under these circumstances "is not a parent as is contemplated by [the Tennessee] legislature, despite each party's characterizations whereby each refers to herself as a 'parent' of the child." *Id.* at 918.[7] The court further explained in denying the right to custody and visitation by the non-biological parent:

We find it inappropriate to legislate judicially such a broad definition of the term 'parent' as relating to legal rights relating to child custody and/or visitation. Just as a grand-parent who provides care and support to a child does not

---

7. Section 36–1–102(26) defines "legal parent" as:

(A) The biological mother of a child;

(B) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;

(C) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;

(D) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed ... an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(E) An adoptive parent of a child or adult[.]

become recognized as being a parent (absent adoption) under Tennessee law, other persons are not recognized as being a parent under Tennessee law based only upon prior care and support of a child. These other persons include any unmarried persons who maintain a close intimate relationship with a child's natural parent, whether they are of the same or opposite sex of that natural parent.

\* \* \*

'To allow the courts to award visitation—a limited form of custody—to a third person would necessarily impair the parents' right to custody and control.'

*Id.* at 918–19 (citations omitted).

In Maryland, the paramount concern in all custody disputes is the best interest of the child. *See Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463 (1952). "In parent-third party disputes, however, there is a twist to the application of the best interest standard." *Ross v. Hoffman,* 280 Md. 172, 176, 372 A.2d 582 (1977). The Court of Appeals explained in *Hoffman:*

[T]he best interest of the child standard is always determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child. Therefore, in parent-third party disputes over custody, it is only upon a determination ... that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition.

*Id.* at 178–79, 372 A.2d 582.

The laws of Maryland and Tennessee are similar in that they give a preference to the natural parent over a third party in a custody dispute. Moreover, the laws are similar in that in

both Maryland and Tennessee, a third party may be awarded custody under the best interest of the child standard if the natural parent is "unfit" or upon a showing of "substantial harm." *Id; see Bond,* 896 S.W.2d at 548. Both Maryland and Tennessee would be available as a forum to hear a dispute on this issue and a Maryland court would not be required to exercise jurisdiction in such an instance.

Unlike Tennessee courts, however, Maryland courts have awarded custody to third parties upon a showing of exceptional circumstances. *See, e.g., Pick,* 199 Md. at 351–52, 86 A.2d 463 (awarding custody of child to third party over natural mother when third party had raised child for ten years after mother abandoned child); *Dietrich v. Anderson,* 185 Md. 103, 116, 43 A.2d 186 (1945) (denying father's petition for custody when child had been living with foster parents for five years); *Pastore v. Sharp,* 81 Md.App. 314, 322, 567 A.2d 509 (1989), *cert. denied,* 319 Md. 304, 572 A.2d 182 (1990) (finding exceptional circumstances when child had been in custody of third party for two of his five years, child had become attached to third party, and his future would lack stability and certainty if placed with the natural mother); *Newkirk v. Newkirk,* 73 Md.App. 588, 595, 535 A.2d 947 (1988) (finding exceptional circumstances in awarding custody of teenage children to half-brother, rather than natural father, when children had resided with half-brother and natural mother until her death, children were emotionally well adjusted, and indicated a preference to remain with half-brother).

In *Hoffman, supra,* the biological mother placed her child in the care of the Hoffmans when the child was three and a half months old. The child remained with the Hoffmans while the mother "assumed a life style which ... would have been incompatible with the best interest of the child." *Hoffman,* 280 Md. at 181, 372 A.2d 582. During this period, the mother visited the child irregularly and made no effort to reclaim the child. Eight years later, the mother attempted to regain custody of the child.

■ The Court of Appeals held that exceptional circumstances existed which justified the trial court's decision to award custody to the Hoffmans. In so doing, the Court explained:

> The factors which emerge from our prior decisions which may be of probative value in determining the existence of exceptional circumstances include the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent.

*Id.* at 191, 372 A.2d 582.

The above cited cases all dealt with situations in which the child had been in the sole physical custody of a third party and not the natural parent. Maryland courts have been far less willing to find exceptional circumstances in situations when a child has lived in the same household as a natural parent and a third party. Indeed, "[w]hatever the law may be elsewhere, Maryland does not recognize a natural mother's long-time, live-in male companion as the 'father' of the mother's children, at least when they were not sired by the male companion." *In re Erica S.*, 71 Md.App. 148, 151–52, 524 A.2d 108 (1987).

In *Lipiano v. Lipiano*, 89 Md.App. 571, 598 A.2d 854 (1991), *cert. denied*, 325 Md. 620, 602 A.2d 710 (1992), Sharron and Jim Lipiano had been married for a number of years when Sharron commenced an adulterous relationship with Dr. Joseph Liss, which resulted in her becoming pregnant in 1984. Jim, however, was named as the child's father on her birth certificate and he "and his parents provided about half of [the child's] care." *Id.* at 573, 598 A.2d 854. Moreover, although there was evidence that Dr. Liss knew he was the child's father, he had no involvement with the child until 1988.

Sharron and Dr. Liss eventually left together, taking the child, and a divorce and custody proceeding between the parties commenced. Jim contended that he was "the natural father of [the child] under the equitable parent doctrine." *Id.* at 574, 598 A.2d 854. This Court disagreed and held that the trial court was not clearly erroneous in awarding custody of the child to Sharron and Dr. Liss. In rejecting the doctrine of "equitable parent" as a basis for gaining custody, we explained:

The language used by the *Ross* [*v. Hoffman*] Court is clear and precise. It does not envisage there being degrees of third parties—'natural' parents who are not biological parents, 'equitable' parents, and others. Certainly, the closeness of the relationship between the child and the non-biological parent is of considerable importance, but that importance relates to whether there are exceptional circumstances which would make an award of custody to the biological parent detrimental to the best interest of the child. It does not, under the *Ross* standards, elevate the third party to initial parity with the biological parent.... [A] person in [the non-biological parent's] position stands as a third party with respect to the child and thus must ... overcome the presumption created by the Court of Appeals.

*Id.* at 577–78, 598 A.2d 854.

We reached a similar result in *Tedesco v. Tedesco,* 111 Md.App. 648, 683 A.2d 1133 (1996), *cert. denied,* 344 Md. 568, 688 A.2d 446 (1997). In *Tedesco,* the child's biological father was killed while the mother was pregnant with the child. Shortly after the child was born, the parties began dating and were eventually married. Two years later, the parties separated and the wife filed for divorce and custody. We upheld the trial court's decision to award custody to the mother because the non-biological parent was "in fact, a 'third party' in relation to [the child's] custody, and he cannot avoid being so characterized merely by virtue of his close relationship with the child." *Id.* at 659, 683 A.2d 1133.

While not awarding custody to a non-biological parent, the Court of Appeals has recognized that exceptional circumstances may arise where it is appropriate to award custody to a third party who resided with the child and the natural mother. *See Monroe v. Monroe,* 329 Md. 758, 772, 621 A.2d 898 (1993). In *Monroe,* the biological mother was granted a court order requiring her husband to submit to a blood test which established he was not the child's biological father. The mother made no attempt to establish paternity in another party. The Court held that the trial court erred in ordering the blood test and explained:

Significant to the best interest determination is the desirability, from the child's perspective, of establishing that the man that is the only father the child has ever known, the husband of the child's mother, and who has acknowledged the child, is, in fact, not the child's father. The effect of that determination is not only to establish that the person who the child regarded as her father, is, in fact, not her father, but also to establish that she has no known father.

*Id.* at 772–73, 621 A.2d 898. The Court further ruled that on remand, the trial court should inquire whether any exceptional circumstances exist that would necessitate an award of custody to the non-biological parent. While the Court explained that it did not intend to "suggest that simply by living with and treating a minor child as his own, that a non-biological 'father'" automatically acquires rights equal to those of a biological parent, *id.* at 776 n. 8, 621 A.2d 898, it recognized that

[a] relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent. That the relationship, one with a known biological parent and the other with an acknowledged, though, in fact, non-biological, parent, progress at the same time, does not render either less viable.

*Id.* at 775–76, 621 A.2d 898 (footnote omitted). The Court, however, did make clear that it was not making a determination regarding whether exceptional circumstances existed.

We do not, of course, express any opinion as to the outcome of this custody matter.... We simply wish to provide guidance for the trial court in addressing the issue of permanent custody. We want to make clear that, using its independent judgment, the court has to determine whether the circumstances of this case are sufficiently exceptional as to rebut the presumption that custody should be awarded to the [biological mother].

*Id.* at 777, 621 A.2d 898.

The above cited cases indicate that appellant is afforded rights under Maryland law that are not guaranteed in Tennessee because under Tennessee law, a third party may only gain custody if there is a finding that parental custody would result in substantial harm to the child. The Tennessee courts will not "engage in a general 'best interest of the child' evaluation unless there has been a finding ... of substantial harm to the child." *Bond, supra,* 896 S.W.2d at 548. Maryland, however, recognizes a third party's right to custody over a natural parent if exceptional circumstances exist which make it in the best interests of the child to award custody to the third party. The Maryland standard creates a substantial category of cases where a third party could obtain custody not permitted under Tennessee law. *See, e.g., Pick,* 199 Md. at 351–52, 86 A.2d 463; *Newkirk,* 73 Md.App. at 593, 535 A.2d 947. Maryland accords standing to the group of persons who can establish exceptional circumstances which relate to the child's best interests, but who could not establish injury to the child from awarding parental custody.[8]

---

8. Were this case to be heard originally by a Tennessee court, it would likely not apply Maryland law because Maryland law is contrary to the policy of Tennessee with respect to the rights of parents to be protected from interference with their right to raise their children by the claims of third parties. *See Hyde v. Hyde,* 562 S.W.2d 194, 196 (Tenn. 1978)("[W]here the law of another jurisdiction is applicable, Tennessee will enforce the substantive rights which litigants have under the laws

While the present decision was pending, the Supreme Court addressed the constitutionality of a non-parental visitation statute in the state of Washington, and held invalid, on substantive due process grounds, a Washington state court decision applying the statute as impermissibly interfering with the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville,* —— U.S. ——, ——, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). The Supreme Court's reasons for finding the Washington state court's intervention to be unconstitutional included the state court's failure to give any special weight to the parent's determination of the child's best interests; that the decision placed the burden on the parent to prove that grandparent visitation was not in the child's best interest; and that there was no requirement that the parent be shown to be unfit. The Court expressly declined, however, to reach the question of whether parental unfitness was always a prerequisite in order to justify intervention in decisions concerning custody and visitation. It also suggested that intervention in

of the other jurisdiction if such rights are not contrary to the policy of Tennessee."). Once a Maryland decision has issued, however, Tennessee will abide by such decision under its version of the Act. *See* Tenn.Code Ann. § 36–6–202; *see also Paltrow v. Paltrow,* 283 Md. 291, 293, 388 A.2d 547 (1978) (stated purpose of Act is to "avoid jurisdictional competition and conflict with courts of other states" requires that "child custody decrees rendered in other states [be] accorded full faith and credit in Maryland."); *In re Marriage of Dagan,* 103 Or.App. 453, 798 P.2d 253, 255 (1990) ("One of the stated purposes of [the Act] is to 'facilitate the enforcement of custody decrees of other states.' ... [After registration of the foreign judgment, the Act] mandates that ... court[s] 'recognize and enforce' custody decrees of other states if the foreign court had properly assumed jurisdiction under statutory provisions substantially similar to those embodied in the UCCJA."). We do not decide what laws would apply if, after a decision on remand of this case, there is a change in circumstances that would justify a modification of the Maryland decision, and the child is domiciled in Tennessee. *Cf. Sutton v. Sutton,* 220 Tenn. 410, 417 S.W.2d 786 (1967) ("A decree of a court of another state granting a divorce and awarding custody of child is binding upon [Tennessee courts]; but, if the child is domiciled in [Tennessee], and there is such change in circumstances surrounding child since divorce as would demand action on part of [a Tennessee court] to protect the child, then jurisdiction is assumed by [Tennessee courts].").

custody and visitation decisions might be justified, when the intervention was "founded ... on special factors," rather than merely a generalized best interest analysis. *Id.* at ——, 120 S.Ct. at 2061. We do not read *Troxel* to be inconsistent with existing Maryland law allowing custody in a non-parent upon a showing of exceptional circumstances.

Under Tennessee law, appellant, as a non-biological parent claiming to be a de facto parent, would have no standing to bring her claim. We hold, therefore, that Tennessee does not provide an available alternative forum for appellant to bring her claim, and accordingly, the trial court erred in dismissing the case without considering appellant's claim.

On remand, appellant must prove that exceptional circumstances exist that would necessitate the award of custody of the child to her. To be sure, her task is a difficult one. A natural parent has a fundamental right relating to the care and custody of his or her child. *See Boswell v. Boswell,* 352 Md. 204, 217, 721 A.2d 662 (1998); *see also Troxel,* —— U.S. at ——, 120 S.Ct. at 2060. As indicated by our holdings in *Tedesco* and *Lipiano,* a non-biological parent who resides with a child and a biological parent is at a considerable disadvantage in a custody proceeding. Moreover, the Supreme Court's recent decision in *Troxel* requires that the court take extra care to apply the exceptional circumstances standard in a manner that protects the fundamental interests of the parent to make custody decisions. *See id.* at ——, 120 S.Ct. at 2063.

Maryland's version of the UCCJA, the Act, gives a party "acting as a parent" the right to bring a custody suit in Maryland if the child "immediately preceding the time involved, lived ... for at least 6 consecutive months" with that person. FL § 9-201(f). The Act defines a person acting as a parent as "a person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody." FL § 9-201(j).

"Physical custody" means "actual possession and control of a child." FL § 9-201(i). We interpret subsection (i) of section 9-201 as including a non-biological parent who

has had joint custody of a child with the biological parent. It is necessary, however, that the non-biological parent plead and prove facts that would establish his or her status as a "person acting as a parent." In the present case, appellant filed an affidavit stating that she has had joint custody of the child, with appellee, all of his life until appellee took the child to Tennessee. She supports this assertion by detailing how: (1) she and appellee "held themselves out to friends, family and service providers" as the child's parents; (2) appellee has, throughout the relationship, referred to the child as having the last names of both appellant and appellee, and as "our son," and referred to appellant as "Mim," which appellant characterizes as a derivative of "mom;" (3) appellant consistently and for several years provided daily care for the child, including feeding him meals, reading to him, bathing him, and putting him to bed, and had a loving relationship with him; (4) appellant was the "birthing coach" at the child's birth; (5) appellant would take the child to doctors' appointments; (6) appellee has referred to appellant's parents as the child's "grandmom" and "grandpop;" (7) appellant and appellee joined "Parents with Pride," a homosexual parenting group; (8) appellee assured appellant that she "would never stand in the way of [appellant's] relationship with the child," (9) appellant has provided significant monetary support for the child. These facts, if proven, are sufficient to show that appellant was a "person acting as parent" within the meaning of section 9–201. Therefore, appellant should be given the opportunity to establish that exceptional circumstances exist that would make it in the child's best interest to grant her custody.

## B.

### Visitation

In addition, we find that the difference between Maryland and Tennessee law regarding visitation requires the trial court to exercise jurisdiction. Tennessee courts will not grant visitation to a non-biological parent in appellant's position. *See In re Thompson,* 11 S.W.3d at 923. Conversely, Maryland courts have allowed visitation to a third party when

it is in the best interest of the child. *See Evans v. Evans,* 302 Md. 334, 339–43, 488 A.2d 157 (1985); *S.F. v. M.D.,* 132 Md.App. 99, 751 A.2d 9 (2000)(allowing visitation by a former domestic partner who qualified as a "de facto parent" to a non-biological child). The Supreme Court's decision in *Troxel* may require some modification of Maryland's standards respecting visitation by third parties, but *Troxel* does not prohibit courts from ordering third-party visitation, so long as the decision-making process affords adequate protection to the parent's constitutional rights. *See Troxel,* —— U.S. at ——, 120 S.Ct. at 2063–64.[9]

Because appellant has the right to seek visitation under Maryland law and not under Tennessee law, there is no available alternative forum for appellant's claim for visitation other than Maryland, and the circuit court must exercise its jurisdiction to hear appellant's visitation claims.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**

---

9. The plurality opinion in *Troxel* implied that the specific standards set forth by our Court of Appeals in *Fairbanks v. McCarter,* 330 Md. 39, 49–50, 622 A.2d 121 (1993), for interpreting the best interests standard when applying Maryland's grandparent visitation statute were elaborated with the degree of care that is desirable when courts act in this area.